UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 3:24-cr-00067-CHB-01, 03 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND ORDER** |
| JOSEPH LANHAM (01), | ) | |
| LAURA LANHAM (03), | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

This matter is before the Court on Defendant Joseph Lanham's[1] Motion to Suppress Evidence and Request for a *Franks* Hearing ("Motion"). [R. 62]. The United States filed a response opposing the Motion. [R. 75]. Joseph then filed a reply.[2] [R. 88]. Defendant Joseph then filed a Renewed Motion for Hearing to Present Witnesses ("Renewed Motion"), [R. 89], and the United States filed a renewed response in opposition, [R. 90]. As such, the matter is ripe and ready for review. For the following reasons, the Court will deny the Motion and the Renewed Motion.

Defendant Laura Lanham also filed a Motion to Adopt and Join In Co-Defendant Joseph's Motion to Suppress Evidence and Request for a *Franks* Hearing ("Motion to Join"). [R. 67]. No response was filed to this Motion to Join, and the Court therefore understands that the United States has no objection to Laura's request. The Court will grant Laura's Motion to Join.[3]

---

[1] For clarity, the Court will refer to Joseph and Laura Lanham by their first names.

[2] The reply covered both the United States' response for this motion as well as the other pending motion to suppress relating to the search and seizure of cellphones and data. *See* [R. 88]; [R. 46].

[3] Although the United States does not raise this issue, Laura does not have standing to challenge any of the warrants outside of the Johnsontown Way Warrant, which is the only warrant that involved her residence. *See infra* pp. 8–9. In any event, as detailed below, the Motion for a *Franks* hearing fails on the merits as to each property.

## I.     BACKGROUND

On June 4, 2024, Defendants Joseph, Laura, and Richard Elble II were indicted by a Grand Jury for Money Laundering Conspiracy (Count 1), Monetary Transactions in Proceeds of Specified Unlawful Activity (Counts 2–5), Obstruction of Proceedings Before Departments and Agencies (Count 6), and Falsification of Records in a Federal Investigation (Count 7). [R. 1]. Joseph was indicted on all counts, while Laura was indicted on Counts 1 and 3. *Id.* The other co-defendant, Elble, was indicted on Count 1. *Id.* All of the defendants have pled not guilty to the charges in the Indictment. *See* [R. 11]; [R. 23]; [R. 24].

According to the facts alleged in the Indictment, Joseph "engaged in narcotics trafficking activities for which he received cash proceeds" and "use[d] various methods to conceal his actual ownership and control over his real and personal property, as well as their source," including having Laura, his mother, and Elble, a relative by marriage, act "as nominee purchasers and owners in his transactions and [carry] out other transactions on his behalf." *See* [R. 1, ¶¶ 2–4].

On August 10 and 11, 2022, search warrants were executed at five different properties owned by or otherwise connected to Joseph or his drug trafficking activities. [R. 75-1, p. 14]; [R. 75-2, p. 25]; [R. 75-3, p. 24]; [R. 75-4, pp. 24–26]; [R. 75-5, p. 25]. These five properties were located at (1) Sea Wave Ct., (2) Johnsontown Way, (3) Nanisinh Way, (4) Pine Lake Dr., and (5) Blankenbaker Access Dr. *Id.* Various drugs, cash, firearms, firearm accessories, and other related items were seized pursuant to these searches. *See id.* The affidavits, including appendices, supporting each of the five warrants spanned numerous pages with evidence gathered from multiple investigations. [R. 75-1, pp. 1–11 (eleven pages)]; [R. 75-2, pp. 1–5, 9–24 (twenty-one pages)]; [R. 75-3, pp. 1–4, 8–23 (twenty pages)]; [R. 75-4, pp. 1–4, 8–23 (twenty pages)]; [R. 75-5, pp. 1–4, 8–23 (twenty pages)]. The warrants each permitted the seizure of any drugs, drug

paraphernalia, evidence of money laundering, records of drug activity or sale, cellular phones or records identifying drug buyers or sellers, firearms, currency attributed to the sale of drugs, and other drug related contraband. [R. 75-1, pp. 12–13].[4]

The affidavits detailed the extensive findings gathered by detectives during the course of their investigation into Joseph and his alleged broader drug trafficking and money laundering operation. *See* [R. 75-2, pp. 10–24]; [R. 75-3, pp. 9–23]; [R. 75-4, pp. 9–23]; [R. 75-5, pp. 9–23].[5] In addition to Joseph, the affidavits include information about his alleged confederates and known drug traffickers—Jordan Marcum, Joseph Alvey, Joshua Boston, Brian Reed Jr., and Joseph M. Lanham ("Little Joe"), Joseph's son, *see* [R. 75-3, p. 22]—and findings from the search of property and residences owned or used by them. *See* [R. 75-2, pp. 10–24]; [R. 75-3, pp. 9–23]; [R. 75-4, pp. 9–23]; [R. 75-5, pp. 9–23]. The affidavits also detail the seizure of several postal packages shipped by Joseph that contained large sums of cash meant for his alleged marijuana supplier in California. *See id.* The affidavits further trace detectives' findings into Joseph's alleged drug trafficking and money laundering operations through the use of direct or electronic observation,

---

[4] The only difference in this regard between the five warrants was that the Sea Wave Ct. Warrant authorized data extraction from cellphones, tablets, and computers, whereas the other four warrants excluded this provision. *Compare* [R. 75-1, pp. 12–13 (Sea Wave Ct. Warrant)], *with* [R. 75-2, pp. 6–8 (Johnsontown Way Warrant)], [R. 75-3, pp. 4–6 (Nanisinh Way Warrant)], [R. 75-4, pp. 5–7 (Pine Lake Dr. Warrant)], *and* [R. 75-5, pp. 5–7 (Blankenbaker Access Dr. Warrant)].

[5] These citations are to "Appendix B," which is attached to each warrant except for the Sea Wave Ct. Warrant and contains much of the same information provided in the affidavit for the Sea Wave Ct. Warrant. *Compare* [R. 75-2, pp. 10–24 (Johnsontown Way Warrant Appendix B)], [R. 75-3, pp. 9–23 (Nanisinh Way Warrant Appendix B)], [R. 75-4, pp. 9–23 (Pine Lake Dr. Warrant Appendix B)], *and* [R. 75-5, pp. 9–23 (Blankenbaker Access Dr. Warrant Appendix B)], *with* [R. 75-1, pp. 2–9 (Sea Wave Ct. Warrant affidavit)]. However, the four warrants that include Appendix B each specifically incorporate all the material within it by reference in the affidavit. [R. 75-2, p. 4]; [R. 75-3, p. 3]; [R. 75-4, p. 3]; [R. 75-5, p. 4]. Appendix B in all four of these warrant affidavits is virtually the same. *Compare* [R. 75-2, pp. 10–24 (Johnsontown Way Warrant Appendix B)], *with* [R. 75-3, pp. 9–23 (Nanisinh Way Warrant Appendix B)], [R. 75-4, pp. 9–23 (Pine Lake Dr. Warrant Appendix B)], *and* [R. 75-5, pp. 9–23 (Blankenbaker Access Dr. Warrant Appendix B)]. For the remainder of this Memorandum Opinion and Order, the Court will refer to Appendix B as part of the affidavit for the warrant in which it was incorporated by reference.

GPS tracking, and the use of a reliable confidential informant ("RCI"), and outline suspected illegal activities occurring at each of the five properties covered by the warrants. *See id.*

Counsel for Joseph filed the instant motion requesting a *Franks* hearing and arguing that the affidavits supporting the warrants contained false information. [R. 62]. The United States filed a response opposing the Motion, [R. 75], and Joseph replied. [R. 88]. As mentioned, Defendants[6] recently filed a Renewed Motion for a *Franks* hearing. [R. 89]. The United States filed a renewed response in opposition. [R. 90]. As such, the matter is ripe and ready for review.

## II.    LEGAL STANDARD FOR A *FRANKS* HEARING

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. "The text of the [Fourth] Amendment thus expressly imposes two requirements. First, all searches and seizures must be reasonable. Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky v. King*, 563 U.S. 452, 459 (2011). These requirements apply to warrants issued in federal and state courts. *United States v. Helton*, 35 F.4th 511, 517 (6th Cir. 2022).

Federal Rule of Criminal Procedure 12(b)(3)(C) permits defendants to file pretrial motions to suppress evidence, which are "appropriate when evidence sought to be introduced in a criminal case is alleged to have been unlawfully obtained." *United States v. Salazar*, No. 1:14-CR-00029-GNS-1, 2016 WL 2903282, at *1 n.1 (W.D. Ky. May 18, 2016) (internal quotation marks and

---

[6] For the remainder of this opinion, the Court uses "Defendants" to refer only to Joseph and Laura. Elble did not join in either the Motion or the Renewed Motion.

citations omitted); *see also United States v. Nailor*, 683 F. Supp. 3d 678, 682 (E.D. Mich. 2023) (citing Fed. R. Crim. P. 12(b)(3)). "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Richards*, 659 F.3d 527, 536 (6th Cir. 2011) (quoting *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)). Should a court find that evidence was unlawfully obtained, "that evidence collected in violation of the Fourth Amendment may be excluded from the criminal trial of the victim of the unlawful search." *United States v. Novak*, 814 F. App'x 1009, 1012 (6th Cir. 2020) (citing *Mapp v. Ohio*, 367 U.S. 643, 648 (1961)). This is known as "the exclusionary rule." *See id.*

A *Franks* hearing, as defendants request here, is an evidentiary hearing where defendants can present evidence challenging the veracity of statements included in the search warrant affidavit. *See Franks v. Delaware*, 438 U.S. 154, 171–72 (1978). If at that hearing, the defendants establish "by a preponderance of the evidence (1) that 'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit,' and (2) that 'with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause,'" then the search warrant "must be voided." *United States v. Keszthelyi*, 308 F.3d 557, 566 (6th Cir. 2002) (quoting *Franks*, 438 U.S. at 155–56). However, search warrant affidavits are entitled to a presumption of validity. *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2009) (citing *Franks*, 438 U.S. at 171). Thus, a defendant challenging an affidavit in support of a search warrant "bears a heavy burden." *Id.*

A defendant is only entitled to a *Franks* hearing to challenge the veracity of the statements in such an affidavit if he

> 1) makes a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or

material omission in the affidavit; and 2) proves that the false statement or material omission is necessary to the probable cause finding in the affidavit.

*United States v. Young*, 847 F.3d 328, 348–49 (6th Cir. 2017) (quoting *United States v. Pirosko*, 787 F.3d 358, 369 (6th Cir. 2015)); *see also Franks*, 438 U.S. at 155–56. An officer's statement is made with "reckless disregard for the truth" only if the defendants can show that the officer "subjectively entertain[ed] serious doubts as to the truth of his [or her] allegations." *Bateman*, 945 F.3d at 1008 (alterations in original) (quoting *United States v. Cican*, 63 F. App'x 832, 836 (6th Cir. 2003)). Finally, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Bateman*, 945 F.3d at 1008 (quotation modified) (quoting *Franks*, 438 U.S. at 171–72).

## III.    ANALYSIS

Defendants claim that they are entitled to a *Franks* hearing because the affidavits supporting the five warrants at issue contain false statements. In their Motion, Defendants specifically allege that (1) the RCI never existed and (2) Marcum never made any statements to investigators inculpating Joseph. [R. 62, p. 3]. In support of the allegation that Marcum never made any such statements, Defendants attach to their motion a sworn affidavit signed by Marcum attesting to this fact.[7] [R. 62-1, pp. 1–3]. Defendants argue that "[t]he probable cause used to obtain these warrants *hinged entirely on these statements*." [R. 62, p. 3 (emphasis added)]. Defendants recently filed a Renewed Motion for a *Franks* hearing claiming that three of the alleged associates of Joseph who were mentioned in the affidavits—Alvey, Reed, and Boston—"did not give any

---

[7] In its response, the United States expresses concerns about the authenticity and procurement of Marcum's affidavit. *See* [R. 75, pp. 4–5 ("It is unlikely that Marcum drafted the proffered affidavit on his own. . . . The challenged warrant affidavits also state that Marcum feared [Joseph] because of threats of violence, which could have provided motivation for signing the affidavit.")]. While the Court understands these concerns, the Court need not address these arguments for resolution of the Motion because the Motion otherwise fails under *Franks*.

statements that the United States claims they made against Joseph Earl Lanham." [R. 89, p. 1]. Before turning to the *Franks* analysis, the Court will first handle some preliminary matters.

First, the current Motion filed on June 17, 2025, is untimely. [R. 62]. According to Joseph's Order Following Arraignment and Scheduling Order, his defensive motion deadline was July 11, 2024—nearly a year earlier. *See* [R. 11, p. 5]. No other orders extended this deadline, and no extension was sought. Neither the United States nor Defendants discuss the Motion's untimeliness. *See generally* [R. 62]; [R. 75]; [R. 88]. Even so, the Court could deny the Motion on this ground alone. *See, e.g.*, *United States v. Walden*, 625 F.3d 961, 964–65 (6th Cir. 2010) (citing Fed. R. Crim. P. 12(c)).

Further, the reply improperly raises new *Franks* arguments. *Compare* [R. 88 (reply)], *with* [R. 62 (Motion)]. The Court need not consider these new arguments. *See Ryan v. Hazel Park*, 279 F. App'x 335, 339 (6th Cir. 2008) (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)) ("Generally, this Court has found that an issue raised for the first time in a reply to a response brief in the district court is waived."); *see also Settle v. Parris*, No. 3:19-CV-32, 2021 WL 1566074, at *5 (E.D. Tenn. Apr. 21, 2021) ("[O]rdinarily, courts do not consider an argument that a party raises for the first time in a reply brief."); *Laughlin v. United States*, No. 20-5433, 2020 WL 9423256, at *2 (6th Cir. Oct. 28, 2020).

Except for an argument related to Joseph's criminal history, which the Court addresses below, these arguments principally culminate in a general denial of Joseph trafficking drugs. *See* [R. 88, pp. 2–3 (stating that "[Joseph] has never been convicted" of trafficking large quantities of drugs and that "[t]here has never been a connection of the dots from narcotics, large sums of money, and/or guns")]. However, this general denial has no bearing on the *Franks* analysis, as it

fails to make a substantial showing that specific false information was included in the warrant affidavits. Further, in doing so, defense counsel misstates the record. Defense counsel claims that

> [a] list of the property seized from [Joseph]'s home is attached hereto and designated **Exhibit 9**. *No drugs were found.* There has never been a connection of the dots from narcotics, large sums of money, and/or guns.

*Id.* at 3 (emphasis added). This claim is plainly contrary to the record and makes the Court question whether defense counsel even reviewed his own exhibit. The "Item Seized Report" for the Pine Lake Dr. Warrant—which is what defense counsel is referring to as "Exhibit 9"—includes numerous entries for drugs, cash, and firearms that were seized from Joseph's home. *See* [R. 88-9, pp. 1–5]. By the Court's count, there are four separate entries for drugs, eight separate entries of "US Currency," and six separate entries for firearms or firearm accessories. *See id.*

Second, the Motion references "six search warrants," [R. 62, p. 2], and Marcum's affidavit includes a sixth property located on Old Church Road, [R. 62-2, p. 2]. In a footnote in its response, the United States mentions this sixth warrant and notes that "the United States has not yet obtained a certified copy, but understands that the same challenges are intended to apply to it, based on the present motion." [R. 75, p. 6 n.2]. However, between all of the briefing and attachments filed, neither Defendants nor the United States have provided this sixth warrant or warrant affidavit for the Court's consideration or made any arguments concerning it. *See generally* [R. 62]; [R. 75]; [R. 88]; [R. 89]; [R. 90]. Consequently, the Court will deny Defendants' Motion insofar as it pertains to this sixth warrant.

Third and lastly, Defendants do not have standing to challenge the Sea Wave Ct. Warrant. The "rights assured by the Fourth Amendment are personal rights" that can only "be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968) (citation omitted); *see also*

*Richards*, 659 F.3d at 536 (quoting *Rakas*, 439 U.S. at 130 n.1) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."). The Sea Wave Ct. Warrant authorized the search of Reed's residence and vehicle. [R. 75-1, pp. 12–13]. As Defendants point out in their own reply "[t]he home is not owed [sic] by or leased by [Joseph]." [R. 88, p. 3]. Consequently, neither Joseph nor Laura have standing to challenge the Sea Wave Ct. Warrant. For similar reasons, Laura does not have standing to challenge any of the other warrants—which involve properties and storage units belonging to Joseph—except for the Johnsontown Way Warrant, which authorized the search of her residence. *See* [R. 75-2, pp. 6–8, 19].[8]

With these preliminary issues addressed, and to ensure a full record, the Court will address the merits of the Motion and consider (1) whether Defendants have made a substantial preliminary showing that the affiant, with an intention to mislead, included false information in the affidavit, and (2) whether that alleged false information was necessary to the probable cause finding supporting the warrants.

### A.    Substantial Showing

As noted above, there exists "a presumption of validity with respect to the affidavit supporting [a] search warrant." *Franks*, 438 U.S. at 171. The Supreme Court has explained that, in light of this presumption, a defendant seeking a *Franks* hearing must present more than conclusory attacks, and his challenge to the search warrant affidavit "must be supported by more than a mere desire to cross-examine." *Id.* More specifically,

> [t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false;

---

[8] Likewise, Joseph likely does not have standing to challenge the Johnsontown Way Warrant, since he apparently neither lived at nor owned this residence. *See* [R. 75-2, pp. 6–8, 19]. Regardless, even if Joseph and Laura had standing with respect to all of the challenged warrants, the Motion for a *Franks* hearing fails on the merits for each property.

and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Id.* (emphasis added).

In the present case, Defendants allege that the five warrant affidavits included false information because (1) the RCI does not exist, [R. 62, p. 3], (2) Marcum never made any statements to investigators incriminating Joseph, *id.*, and (3) Alvey, Reed, and Boston likewise never made any statements against Joseph, [R. 89, p. 1]. In their reply, Defendants also allege that the affidavits contained false information about the extent of Joseph's drug trafficking activities and criminal history. [R. 88, p. 2].

### 1.    Statements by RCI, Alvey, Reed, and Boston

The first principal allegation is that the RCI who detectives used throughout their investigation of Joseph and referenced in the affidavits never actually existed. [R. 62, p. 3]. Specifically, they argue that "[Joseph] has evidence that there was no confidential informant." *Id.* They further state that "[t]here is no indication in the government's response to discovery that a [RCI] will testify or disclosed [sic] the [RCI]'s identity or any corroborating documentation that a [RCI] ever actually existed." *Id.* In its response, the United States rightly points out that "[t]he defendants make no specific offer of proof to negate the existence of a [RCI] or any of the statements made by that [RCI]." [R. 75, p. 3]. The Court agrees.

Defendants' claim that no RCI exists is nothing but a bare assertion, a far cry from the substantial showing required by *Franks*. Defendants state that "[Joseph] has evidence" of this fact, [R. 62, p. 3], yet they provide none in support of their claim. Nowhere do Defendants provide any proof substantiating their claim that the RCI does not exist. Their bare assertion fails to meet their burden under the first prong of *Franks*.

Similarly, Defendants filed a Renewed Motion for a *Franks* hearing alleging that Alvey, Reed, and Boston will give testimony that "they did not give any statements that the United States claims they made against Joseph." [R. 89, p. 1]. Defendants further state that Boston "claims he never made any statements against Defendant [Joseph], that his drug charges had nothing to do with [Joseph], and that there was no information in his phone about [Joseph]." *Id.* As with the RCI allegation, Defendants make a conclusory attack only and fail to provide any evidence to support that claim. They again fail to make a substantial showing under *Franks*. *See Franks*, 438 U.S. at 171.

### 2.    Statements by Jordan Marcum

Defendants also argue that Marcum never made any statements to investigators incriminating Joseph contrary to what the affidavits provide. [R. 62, p. 3]. In support, defense counsel attaches to the Motion a sworn affidavit by Marcum denying that he ever made the statements that the warrant affidavits claim that he did. *See* [R. 62-2, pp. 1–3]. Specifically, the sworn affidavit by Marcum claims the following:

> Prior to my charges, I have never met Joseph Earl Lanham. I was introduced to [Joseph] after I was charged because I was being accused of hearsay that I was making statement against [Joseph]. I communicated with [Joseph] by phone explaining that I since I did not know him and could not recognized [sic] him, I never made any such statement. During my case, I could not have made statements implicating [Joseph] since I have not met [Joseph] until afterwards.

*Id.* at 1. As far as the Court can tell, Marcum's testimony and Defendants' argument is that because Marcum allegedly had never met Joseph before the date that Marcum supposedly implicated him, Marcum could never have made the statements attributed to him in the warrant affidavits. *See id.*

While Defendants have supplied some offer of proof by way of Marcum's affidavit, the Court need not decide whether Defendants have met *Franks*' "substantial showing" prong because—as discussed in detail below—Defendants' Motion fails under the second prong of

*Franks*. Namely, even when setting aside the challenged information, sufficient evidence remains to support a finding of probable cause for each of these warrants.

### 3.    Joseph's Criminal History

Defendants raise a new *Franks* hearing argument in their reply. Specifically, they argue that the warrants were "based on false information and mere speculation" because the affidavits alleged "that [Joseph] was found to be in position [sic] of large amounts of marijuana." [R. 88, pp. 1–2]. But, defense counsel argues, "[Joseph] has never been convicted of being in possession of or trafficking in large amounts of marijuana." *Id.*

First, this argument was improperly raised for the first time in Defendants' reply. *Compare* [R. 88 (reply)], *with* [R. 62 (Motion)]. Accordingly, the Court need not consider it. *See Ryan*, 279 F. App'x at 339 (citing *Scottsdale Ins. Co.*, 513 F.3d at 553) ("Generally, this Court has found that an issue raised for the first time in a reply to a response brief in the district court is waived."); *see also Settle*, 2021 WL 1566074, at *5 ("[O]rdinarily, courts do not consider an argument that a party raises for the first time in a reply brief."); *Laughlin*, 2020 WL 9423256, at *2. Even considering the argument, it fails.

By way of background, the warrant affidavits[9] contain a CourtNet history search for Joseph, that reads as follows:

> Detectives conducted a Courtnet history search of Joseph Earl Lanham and found the following:
> - 19-CR-3382 – enhanced traff marijuana, fleeing and evading police 2nd on foot.
> - 16-F-9985 – enhanced traff marijuana over 5lbs, traff controlled substance 1st degree drug unspecified, receiving stolen property firearms
> - 11-F-7990 – Traff Controlled substance 1st degree meth over 2gms
> - 01-F-232866 – traff in marijuana with a minor.

---

[9] The Sea Wave Ct. Warrant affidavit makes no mention of Joseph's criminal history. *See* [R. 75-1, pp. 2–9 (Sea Wave Ct. Warrant affidavit)].

[R. 75-2, p. 10]; [R. 75-3, p. 9]; [R. 75-4, p. 9]; [R. 75-5, p. 9]. In support of the argument that Joseph's drug trafficking activities—or criminal history—are overstated, defense counsel attaches several CourtNet documents related to Joseph, Boston, and Marcum. [R. 88-3]; [R. 88-4]; [R. 88-5]; [R. 88-6]; [R. 88-7]; *see also* [R. 88, pp. 1–2]. Most of these items are plainly irrelevant. As mentioned, they include the disposition of cases involving Boston, [R. 88-5], and Marcum,[10] [R. 88-7], that Joseph was never a party to. They also include the dismissal without prejudice— pending disposition of this federal prosecution—of the state charges relating to the same underlying conduct of the instant case. [R. 88-6].

The only case involving Joseph cited in the reply that was listed in the search warrant affidavit was 19-CR-3382. *Id.* at 2. But in doing so, defense counsel misstates the record, claiming that "the case was dismissed." *Id.* This is simply not true. As defense counsel's own exhibit shows, the 2019 case was not dismissed. *See* [R. 88-4, p. 1]. Instead, the charge of "Enh Traffic in Marijuana, > 5 Lbs" was ultimately amended down to "Traffic in Marijuana, Less Than 8 Oz." *Id.* He was found guilty of this amended-down charge as well as a charge of "Fleeing or Evading Police." *Id.* at 1–2. The reply later acknowledges that Joseph was convicted of this lesser drug trafficking charge. *See* [R. 88, pp. 2].

Finally, the reply references a drug trafficking allegation from 2016 and argues that the case was "dismissed and expunged." [R. 88, p. 1]. Defense counsel attaches a CourtNet print out that contains no reference to a 2016 case against Joseph. [R. 88-3]. Nor do any of his other attachments. *See generally* [R. 88-4]; [R. 88-5]; [R. 88-6]; [R. 88-7]. As best the Court can tell, defense counsel is arguing that the CourtNet history listed in the affidavits falsely references a 2016 case—16-F-9985—which Defendants allege has been "dismissed and expunged." *Compare*

---

[10] Marcum's case was not mentioned in the reply, *see* [R. 88, pp. 1–2], but was attached as an exhibit, [R. 88-7].

[R. 88, p. 1 (reply)], *with* [R. 75-2, p. 10 (Johnsontown Way Warrant)], [R. 75-3, p. 9 (Nanisinh Way Warrant)], [R. 75-4, p. 9 (Pine Lake Dr. Warrant)], *and* [R. 75-5, p. 9 (Blankenbaker Access Dr. Warrant)]. But even assuming that this charge was ultimately dismissed and expunged, Defendants have made no substantial showing that a materially false statement appears in the warrants. The warrant affidavits make no mention of the ultimate disposition of the listed cases. Instead, the affidavits simply provide that "Detectives conducted a Courtnet history search of Joseph Earl Lanham and found the following." [R. 75-2, p. 10]; [R. 75-3, p. 9]; [R. 75-4, p. 9]; [R. 75-5, p. 9]. Defendants have failed to make a substantial showing that any information concerning Joseph's criminal history or alleged involvement in drug trafficking was false, much less that the affiant included this allegedly false information either intentionally or with a reckless disregard for the truth. *See Franks*, 438 U.S. at 171.[11]

In sum, with the *possible* exception of Marcum's statements, Defendants have failed to meet their burden of showing that false statements were included in the warrant affidavits, much less that they were made intentionally or with a reckless disregard for the truth. The Court now turns to the probable cause analysis under the second prong of *Franks*.

### B.    Necessary for Probable Cause

The Fourth Amendment guarantees that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Supreme Court has explained that, so long as the magistrate judge had a "substantial basis for . . . concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Illinois v. Gates*, 462 U.S. 213, 236 (1983). More specifically, the magistrate judge "must find that 'given all the circumstances set

---

[11] For the reasons outlined below, even if the Court excluded any reference to the 2016 case from the affidavits, probable cause remains.

forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009) (quoting *Gates*, 462 U.S. at 236). In other words, "the affidavit supporting the search warrant must demonstrate a nexus between the evidence sought and the place to be searched." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (citing *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004)). To meet this nexus requirement, "the circumstances must indicate why evidence of illegal activity will be found in a particular place." *Carpenter*, 360 F.3d at 594 (citation and internal quotation marks omitted). The affidavit must indicate "that there is reasonable cause to believe that the specific thing to be searched is located on the property to which entry is sought, and not merely that the owner of the property is suspected of a crime." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006)) (quotation modified) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)).

For example, in *Berry*, officers were investigating a drug operation when they received a tip that the defendant, Berry, was living in the same duplex as the subject of their investigation, who was a known drug dealer. 565 F.3d at 335–36. The officers were familiar with Berry's criminal history, including a drug trafficking conviction, and his status as a probationer. *Id.* at 335. Berry's status as a probationer required him to notify his probation officer of this most recent address change, something he had not done. *Id.* Officers eventually arrested Berry in the driveway of the duplex and searched his vehicle incident to the arrest. *Id.* In the car, they found cocaine. *Id.* Officers then obtained a search warrant for the duplex, which allowed them to search for evidence of drugs and evidence establishing that Berry lived at the property in violation of his terms of probation. *Id.* at 335–37. After both drugs and guns were found in the home, Berry was charged with several drug trafficking and firearms charges. *Id.* at 337.

Berry filed a motion to suppress, arguing that the search warrant affidavit failed to establish the requisite nexus between the duplex and the drug activity. *Id.* The district court denied the motion. *Id.* On appeal, the Sixth Circuit affirmed, explaining that

> [a]lthough a defendant's status as a drug dealer, standing alone, does not give rise to a fair probability that drugs will be found in defendant's home, there is support for the proposition that status as a drug dealer plus observation of drug activity near defendant's home is sufficient to establish probable cause to search the home.

*Id.* at 339 (internal citations omitted). In *Berry*, the warrant established probable cause, as it specified that the defendant was known to be involved in drug trafficking based on a prior conviction, and officers discovered crack cocaine in his car during the search incident to arrest. *Id.* It also noted that he had been renting the duplex under an alias and paid his rent in cash, facts that the officers had uncovered during the course of their investigation. *Id.* Finally, the affiant-officer stated that based on his experience, vehicles "parked on the premise of the places where controlled substances are found or sold oftentimes contain controlled substances." *Id.* (quoting the affidavit). The Sixth Circuit therefore concluded that "[c]ertainly, the affidavit established 'a fair probability that contraband or evidence of a [drug] crime' would be found at" the duplex. *Id.* (quoting *Gates*, 462 U.S. at 238).

In a separate instance, the Sixth Circuit has found that a search warrant affidavit lacks probable cause if it does nothing more than state where the defendant resides and that the defendant has been found with a quantity of crack cocaine on his person during an unrelated arrest. *McPhearson*, 469 F.3d at 524. In *McPhearson*, the defendant had been arrested on an outstanding warrant for simple assault and was not known to be involved in drug trafficking. *Id.* at 524–25. The Sixth Circuit concluded that there was an insufficient nexus between the residence and the defendant's drug activity to create the probable cause necessary to search his residence. *Id.*; *see also Brown*, 828 F.3d at 382 (failing the nexus requirement to find probable cause where the search

- 16 -

warrant affidavit "contained no evidence that Brown distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there."). However, where the affidavit includes facts outlining suspected drug activity in and around a known drug dealer's residence, then probable cause and its nexus requirement are satisfied. *See Berry*, 565 F.3d at 339.

Here, Defendants' motion focuses exclusively on the RCI and Marcum in addressing probable cause; that is, the reply and Renewed Motion fail to address the merits of probable cause. Defendants argue that absent "the alleged [RCI], and the statement made by Mr. Marcum, there was no probable cause to search the Defendant's properties." [R. 62, p. 3]. They argue that "[t]he probable cause used to obtain these warrants *hinged entirely on these statements*." *Id.* (emphasis added). The Court disagrees and questions whether defense counsel even read the full warrant affidavits before making the baseless claim that the affidavits hinged entirely on Marcum and the RCI. The affidavits—including appendices—supporting each of the five warrants spanned numerous pages with evidence gathered from multiple, expansive investigations. [R. 75-1, pp. 1–11 (eleven pages)]; [R. 75-2, pp. 1–5, 9–24 (twenty-one pages)]; [R. 75-3, pp. 1–4, 8–23 (twenty pages)]; [R. 75-4, pp. 1–4, 8–23 (twenty pages)]; [R. 75-5, pp. 1–4, 8–23 (twenty pages)].

Although Defendants have wholly failed to make *any* showing (much less a substantial one) of false information within the affidavits (except *possibly* as to Marcum, which was supported by an affidavit), for purposes of the Court's probable cause analysis, it will assume that Defendants have met their "substantial showing" burden under the first step of *Franks* as to (1) the existence of the RCI; (2) Marcum's statements; and (3) Alvey's, Reed's, and Boston's statements. Accordingly, the Court will set aside any and all statements attributed to the RCI, any use of the RCI to purchase drugs from Reed or others, and any statements by Marcum, Alvey, Reed, or Boston that in any way incriminate Joseph. *See id.* As detailed below, even removing this evidence,

the contents of the affidavits still support a finding of probable cause. Accordingly, Defendants are not entitled to a *Franks* hearing. *Franks*, 438 U.S. at 171–72 ("Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.").

### 1.    General Evidence Supporting Probable Cause for all Five Warrants

Before addressing the probable cause evidence specific to the five properties, the Court will first trace some of the extensive evidence outlined in the affidavits that relates more broadly to Joseph and his associates, including Little Joe and others, and their alleged illegal activities including drug trafficking and money laundering.

As noted above, Joseph's criminal history includes a 2019 conviction for trafficking marijuana, [R. 88-4, p. 1], along with other charges, the disposition of which is not entirely clear from the CourtNet print outs. *See* [R. 75-2, p. 10]; [R. 75-3, p. 9]; [R. 75-4, p. 9]; [R. 75-5, p. 9]. A prior drug trafficking conviction may be considered as part of the probable cause calculus. *See United States v. Sanders*, 106 F.4th 455, 461–62 (6th Cir.), *cert. denied*, 145 S. Ct. 603 (2024) (stating that the "exploration of a suspect's criminal history" is one of the "time-honored markers in our Fourth Amendment jurisprudence"); *United States v. Talley*, 692 F. App'x 219, 222–23 (6th Cir. 2017) (discussing how a defendant's prior drug conviction is a relevant consideration for probable cause even when the conviction is over nine years old).

The affidavits detail years-long investigations into Joseph and his associates relating to drug trafficking, money laundering, and other criminal activities. This includes investigations by Detective Pawul of Louisville Metro Narcotics, who advised that "[Joseph] is trafficking large amounts of marijuana throughout Louisville, upwards of hundreds of pounds a week. . . . [and]

routinely deal[s] in hundreds of thousands of dollars from the sale of narcotics." [R. 75-2, p. 10]; [R. 75-3, p. 9]; [R. 75-4, p. 9]; [R. 75-5, p. 9]. Further, detectives observed Joseph make numerous "short stays" throughout Louisville consistent with drug trafficking and meet up with known and suspected narcotics traffickers. *Id.*; *see also United States v. Briggs*, No. 23-1963, 2024 WL 5135701, at *2–3 (6th Cir. Dec. 17, 2024), *cert. denied*, 145 S. Ct. 1945 (2025) (finding that the frequency and duration of short stays supported probable cause of drug trafficking). Jeffersontown Police Department detectives also observed Joseph using counter surveillance techniques to evade or look for police surveillance in a manner common amongst narcotics traffickers. [R. 75-2, p. 10]; [R. 75-3, p. 9]; [R. 75-4, p. 9]; [R. 75-5, p. 9]; *see also United States v. $99,990.00 in U.S. Currency*, 69 F. App'x 757, 761 (6th Cir. 2003) ("Courts have recognized such counter-surveillance techniques as incriminating."); *United States v. Health,* 259 F.3d 522, 529 (6th Cir. 2001) (considering the defendant's use of counter-surveillance techniques as a basis for reasonable suspicion).

Officers frequently observed Joseph associating with other known drug traffickers. *See United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991) (considering the defendant's association with known or convicted drug traffickers in a probable cause analysis); *Libretti v. Woodson*, 600 F. App'x 367, 372 (6th Cir. 2015) ("[A]ssociation with suspected and known drug traffickers is another appropriate consideration."). This included his son, Little Joe, who lived with Joseph at his residence at Pine Lake Dr. [R. 75-2, p. 20]; [R. 75-3, p. 19]; [R. 75-4, p. 19]; [R. 75-5, p. 19]. In two separate instances, a Dodge Charger driven by Little Joe fled officers in excess of one hundred miles per hour. [R. 75-2, p. 11–12]; [R. 75-3, p. 10–11]; [R. 75-4, p. 10–11]; [R. 75-5, p. 10–11]. Soon after, officers located the Charger with Little Joe at the wheel. A search of the vehicle produced a handgun, individual packages of marijuana consistent with trafficking, and an

- 19 -

undetermined amount of cash. [R. 75-2, p. 12]; [R. 75-3, p. 11]; [R. 75-4, p. 11]; [R. 75-5, p. 11]; *see also id.* (describing multiple meetings between Joseph and Artemia Medina, a known cocaine trafficker, at Joseph's residence and one meeting at Medina's residence).

The affidavits also include information about known drug trafficker, Joseph Alvey, whose storage unit, residence, and mother's residence were searched by Jeffersontown Police detectives months before the instant searches, uncovering an estimated $130,000 in cash, money counters, marijuana packaging materials, forged vehicle titles, and cell phones. [R. 75-1, p. 5]; [R. 75-2, p. 11]; [R. 75-3, p. 10]; [R. 75-4, p. 10]; [R. 75-5, p. 10]. During the investigation, detectives observed Joseph's GMC truck—seemingly driven by Joseph or Little Joe—at Alvey's mother's residence. [R. 75-2, p. 12]; [R. 75-3, p. 11]; [R. 75-4, p. 11]; [R. 75-5, p. 11]. Further, the affidavits provide that the "[d]etective knows Alvey and have a relationship revolved around trafficking large amounts of marijuana." *Id.*

The affidavits similarly describe the activities of known drug trafficker, Joshua Boston, who detectives believed served as Joseph's drug runner until Boston's arrest. [R. 75-1, p. 5]; [R. 75-2, p. 11]; [R. 75-3, p. 10]; [R. 75-4, p. 10]; [R. 75-5, p. 10]. Using GPS tracking, detectives uncovered Boston's stash location, where a search uncovered over two hundred pounds of marijuana, over forty pounds of THC cartridges, $2,897 in cash, packaging materials, other various drugs, and a firearm. *Id.* A separate search of Boston's phone revealed messages between Boston and an individual identified only as "J" reflecting Boston was moving large amounts of marijuana for "J." *Id.* Officers had knowledge that Boston continued to traffic marijuana and at one point observed Little Joe, driving Joseph's GMC truck, visit Boston's stash location for approximately thirty minutes, where officers believe Little Joe was collecting money for Joseph. [R. 75-2, p. 12]; [R. 75-3, p. 11]; [R. 75-4, p. 11]; [R. 75-5, p. 11].    Further, the affidavits state that "contact

between Boston and [Joseph] has been for the purpose of trafficking large amounts of marijuana." *Id.*

The affidavits also included information about known drug trafficker, Brian Reed Jr., who detectives believe became Joseph's drug runner after Boston was arrested. [R. 75-1, pp. 4, 6]; [R. 75-2, p. 10]; [R. 75-3, p. 9]; [R. 75-4, p. 9]; [R. 75-5, p. 9]. Detectives witnessed Joseph and Reed meet up multiple times throughout the investigation. [R. 75-2, p. 18]; [R. 75-3, p. 17]; [R. 75-4, p. 17]; [R. 75-5, p. 17]. They would often do so late at night, in a parking lot, and would meet only for a short time. *Id.* Detectives believed that these activities were consistent with drug trafficking and the delivery of cash to Joseph for shipment to his source of supply in California. *Id.*

The search of Reed's Sea Wave Ct. residence—discussed in in the next section—yielded approximately twenty to thirty pounds of marijuana, THC cartridges, drug ledgers, scales, a firearm, and a large amount of cash. [R. 75-2, p. 19]; [R. 75-3, p. 18]; [R. 75-4, p. 18]; [R. 75-5, p. 18]; *see also* [R. 75-1, p. 4 (Item Seized Report for the Sea Wave Ct. Warrant)]. Importantly, this search occurred on August 10, 2022, the day before the searches for the remaining four properties at issue in this case. The search warrant affidavits for the remaining four properties incorporated the search results and information related to Reed's residence as part of the calculus for probable cause. [R. 75-2, p. 19]; [R. 75-3, p. 18]; [R. 75-4, p. 18]; [R. 75-5, p. 18].

Finally, the affidavits detail how agents twice tracked Joseph departing his Pine Lake Dr. residence in his GMC truck carrying several large white postal boxes, traveling to multiple post office locations, and depositing the boxes for shipment to California. [R. 75-1, p. 6–7]; [R. 75-2, p. 13–16]; [R. 75-3, p. 12–15]; [R. 75-4, p. 12–15]; [R. 75-5, p. 12–15]. The boxes, which had alias sender information and return addresses, were intercepted by law enforcement and ultimately

searched after a detection dog, Maya, alerted on the packages. *Id.* The packages contained approximately $110,000 in cash that had been extensively wrapped in vacuum-sealed packages. *Id.* No one ever made a formal loss claim for the seized packages, notwithstanding the fact that they contained large sums of cash. *Id.*

### 2.    Sea Wave Ct. Warrant, [R. 75-1]

The Sea Wave Ct. Warrant authorized the search of Reed's residence and vehicle and phone. [R. 75-1, pp. 12–13]. As mentioned, detectives had evidence that Reed served as Joseph's drug runner after Boston was arrested. *Id.* at 6. The affidavit section titled "Brian Reed Jr and 4103 Sea Wave Ct. Louisville Ky.," *id.* at 7–10, details the investigators' findings related to Reed's drug trafficking and money laundering activities and his Sea Wave Ct. residence. *See id.* The highlights include the following evidence: detectives following Reed, a known narcotics trafficker with multiple marijuana convictions, and observing him leave his residence and make multiple short stays around Jefferson County, *id.* at 8; multiple instances of Reed carrying large garbage bags from his house to his vehicle, leaving with those bags, and then making short stops at various locations, including locations of known narcotics traffickers, then returning to his house *id.* at 8–9; and an instance where Reed brought a small black bag into this residence that was consistent with bags used to carry a large amount of cash, *id.* at 8. As mentioned previously, officers also surveilled Joseph and Reed meeting at various locations throughout Louisville, often at night and in parking lots, for brief exchanges. *Id.* at 9.  On one occasion, officers observed two individuals enter Reed's residence with a backpack, stay for only eleven minutes, and then leave with the backpack looking "considerably fuller." *Id.* at 8. The detectives followed these individuals and attempted to pull them over. *Id.* The individuals fled the scene and dropped the backpack, which contained three to five pounds of marijuana. *Id.*

- 22 -

The Sea Wave Ct. Warrant, even setting aside the challenged evidence, contained sufficient probable cause that Reed was conducting drug trafficking activities (and handling cash proceeds) at this location and that evidence of these illegal activities would be found at the residence, satisfying the nexus requirement established in *Gates*. *See Berry*, 565 F.3d at 339; *Brown*, 828 F.3d at 378–79 (considering as evidence of probable cause ); *Novak*, 814 F. App'x at 1011 (considering officers' observations of drug buys at a residence as evidence supporting criminal activity under the good-faith exception); *United States v. Gunter*, 266 F. App'x 415, 419 (6th Cir. 2008) ("[A] nexus exists between a known drug dealer's criminal activity and the dealer's residence when some reliable evidence exists connecting the criminal activity with the residence.").

### 3.      Johnsontown Way Warrant, [R. 75-2]

The Johnsontown Way Warrant authorized the search of Laura's residence. [R. 75-2, pp. 6–8, 19]. The affidavit section titled "9606 Johnsontown Way Louisville Ky 40258" details the investigators' findings using property records, FinCEN queries, and IRS agents, related to Joseph's extensive financial dealings and his use of cash and nominees—like Laura—to purchase and hold real estate, allegedly using drug proceeds. *Id.* at 19–20. The affidavit also describes suspected drug activity occurring at Laura's Johnsontown Way residence. *See id.*

The highlights include the following evidence: Joseph's use of nominees (often people close to him, like Laura), to purchase and hold real estate using cash, *id.* at 19; Laura strictly using cash for her last two known real estate purchases, even though she had bank accounts and no significant cash transactions based on FinCEN queries were found for Laura, *id* at 19–20; law enforcement previously conducting a controlled delivery of two hundred pounds of marijuana to Joseph at this address and $160,000 cash recovered from his vehicle, *id.* at 20; and detectives

observing multiple instances, including in the days leading up to the search, of Reed making "short stops" at this residence, including one instance where detectives witnessed Reed load a small bag—consistent with a large amount of cash—into his vehicle, drive directly to Laura's residence, stay for approximately two minutes, drive back to his Sea Wave Ct. residence, and then enter his residence without the bag, *id.*

The Johnsontown Way Warrant, even setting aside the challenged evidence, contained sufficient probable cause that Laura and Joseph were conducting drug trafficking and money laundering activities at this location and that evidence of these illegal activities would be found at the residence, satisfying the nexus requirement established in *Gates*. *See Berry*, 565 F.3d at 339; *United States v. 1978 Cessna Turbo 210*, No. 97-6254, 1999 WL 407469, at *6 n.7 (6th Cir. 1999) (citing *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1440–42 (11th Cir. 1991)) (finding that probable cause existed in part because the property was purchased with a large amount of cash).

### 4.    Nanisinh Way Warrant, [R. 75-3]

The Nanisinh Way Warrant authorized the search of a vacant residence owned by Joseph. [R. 75-3, pp. 4–6, 22]. The affidavit section titled "7104 Nanisinh Way. Louisville Ky. 40258" details the investigators' findings, using electronic surveillance and other investigative tools, related to Joseph's and Little Joe's alleged drug trafficking, money laundering, and other illegal activities that involved the Nanisinh Way property. *Id.* at 22–23.

The highlights include detectives observing Joseph and Little Joe coming and going frequently from this residence but never staying overnight, and Little Joe taking items to and from this residence consistent with packages of marijuana and cash. *Id.* at 22. On one occasion, detectives observed Little Joe arrive at Nanisinh Way with a second male, and the unidentified

male walk out of the residence with something hidden under his sweatshirt. Little Joe then later carried out a bag from the house, placed it in the car, and left, only to return a few hours later carrying the bag inside, and then leaving within a minute with nothing. *Id.* The affidavit also describes an instance where Little Joe arrived at the residence empty-handed, left carrying a small bag, drove to a barber shop, and the barber was later arrested with ten pounds of marijuana. *Id.* Further, Nanisinh Way is the last place detectives spotted a certain Chevrolet Corvette, suspected by detectives to be stolen and part of Joseph's illegal activities involving the "re-vinning" of stolen vehicles.[12]

The Nanisinh Way Warrant, even setting aside the challenged evidence, contained sufficient probable cause that Joseph and Little Joe were conducting drug trafficking and stolen-vehicle re-vinning activities at this location and that evidence of these illegal activities would be found at the residence, satisfying the nexus requirement established in *Gates*. *See Berry*, 565 F.3d at 339; *Novak*, 814 F. App'x at 1011 (considering officers' observations of drug buys at a residence as evidence supporting criminal activity under the good-faith exception); *Gunter*, 266 F. App'x at 419 ("[A] nexus exists between a known drug dealer's criminal activity and the dealer's residence when some reliable evidence exists connecting the criminal activity with the residence.").

### 5.    Pine Lake Dr. Warrant, [R. 75-4]

The Pine Lake Dr. Warrant authorized the search of Joseph's and Little Joe's primary residence. [R. 75-4, pp. 4–6, 22]. The residence was owned by co-defendant Elble. *Id.* at 22. The affidavit section titled "8904 Pine Lake Dr. Jeffersontown Ky 40299" details the investigators' findings related to their alleged drug trafficking, money laundering, and other illegal activities that involved the Pine Lake Drive residence. *Id.* at 19–20.

---

[12] *See infra* pp. 26–27.

The highlights include the following evidence: detectives observing Joseph collecting money from suspected narcotics transactions and bringing it straight to this house, *id.* at 19; Joseph meeting with numerous known drug traffickers at this residence, *id.*; and the seized postal parcels containing large amounts of cash that Joseph carried out of this residence before traveling to multiple post office locations to ship them to California, *id.*; *see also id.* at 12–15 (postal warrant sections). The stolen Chevrolet Corvette was also observed at this location. *Id.*

The Pine Lake Dr. Warrant, even setting aside the challenged evidence, contained sufficient probable cause that Joseph was using this residence to conduct his alleged drug trafficking, money laundering, and stolen-vehicle re-vinning activities and that evidence of these illegal activities would be found at the residence, satisfying the nexus requirement established in *Gates*. *See Berry*, 565 F.3d at 339.

### 6.    Blankenbaker Access Dr. Units # 134 & 135 Warrant, [R. 75-5]

The Blankenbaker Access Dr. Warrant authorized the search of two storage units rented by Joseph. [R. 75-5, pp. 5–7, 20–22]. The affidavit sections titled "11440 Blankenbaker Access Dr. Unit #'s 134 & 135" and "Stolen Vehicles/Fraudulent Titles" detail the investigators' findings related to Joseph's drug trafficking, money laundering, and stolen-vehicle "re-vinning" activities. *See id.* The highlights include evidence that the paperwork for the storage units traced back to Joseph and stated that the property stored there included an SRT Charger worth $55,000 and a Jeep worth $80,000. *Id.* at 20.  Detectives believed Joseph had purchased the vehicles with drug trafficking proceeds. *Id.* at 20. Further, detectives believed that at least one of these vehicles was re-vinned and stolen. *Id.* The affidavit provided extensive evidence of Joseph and his associates allegedly re-vinning stolen vehicles to make their titles appear "clean." *Id.* at 20–22. This included the Corvette that detectives last spotted at the Nanisinh Way residence, and an SRT Charger—the

same type of vehicle that Little Joe fled the police in. *Id.* Detectives believed that there was a "high probability that paperwork and Forged Titles" would be found in these units, as well as Joseph's Pine Lake Dr. residence. *Id.* at 21. As part of the broader scheme, detectives also noted that drug traffickers often used storage units like these to store cash proceeds from their drug trafficking. *Id.* at 20; *see also Sanders*, 106 F.4th at 461–62 (stating that the "averments about an officer's training and experience" is one of the "time-honored markers in our Fourth Amendment jurisprudence").

The Blankenbaker Access Dr. Warrant, even setting aside the challenged evidence, contained sufficient probable cause that Joseph was using these units to store potentially stolen vehicles believed to be purchased with the proceeds of drug trafficking, and that evidence of these illegal activities—including cash proceeds, and/or associated paperwork and vehicle titles—would be found in the units, satisfying the nexus requirement established in *Gates*. *See Berry*, 565 F.3d at 339; *United States v. Elbe*, 774 F.3d 885, 889–90 (6th Cir. 2014) (stating that the "nexus can be inferred from the type of crime being investigated, the nature of things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places." (internal quotation marks and citation omitted)); *United States v. Burrus*, No. 2:21-CR-20204-JTF, 2023 WL 4397268, at *8–9 (W.D. Tenn. May 3, 2023), *report and recommendation adopted*, No. 2:21-CR-20204-JTF-1, 2023 WL 4118784 (W.D. Tenn. June 22, 2023) (finding probable cause to search storage units rented by the defendant because he was tied to drug trafficking activities, the storage units were accessed after he told associates to hide evidence, and the affiant stated that—based on his experience—drug traffickers often use storage units to house drug proceeds, ledgers, financial documents, and other related assets).

In sum, Defendants have failed to demonstrate that the warrants, even excluding the challenged evidence, lacked sufficient probable cause to search the various properties. Accordingly, their Motion for a *Franks* hearing and related Renewed Motion will be denied.

## IV.    CONCLUSION

Therefore, and the Court being otherwise sufficiently advised, it is **HEREBY ORDERED** as follows:

1. Defendant Laura Lanham's Motion to Join, [**R. 67**], is **GRANTED**.

2. The Second Motion to Suppress, [**R. 62**], is **DENIED**.

3. The Renewed Motion, [**R. 89**], is **DENIED**.

This the 14th day of October, 2025.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY