UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA,    )
                             )
        Plaintiff,           )    Criminal Action No. 3:24-CR-67-CHB-01
                             )
v.                           )
                             )    **MEMORANDUM OPINION AND**
JOSEPH LANHAM (01),          )    **ORDER**
                             )
        Defendant.           )

\*\*\*    \*\*\*    \*\*\*    \*\*\*

This matter is before the Court on numerous motions filed by Defendant Joseph Lanham (hereinafter, "Defendant").[1] These include Defendant's Pro Se Motion to Withdraw Guilty Plea Pursuant to Federal Rule of Criminal Procedure 11(d)(2)(B), [R. 199]; [R. 207 (re-filed fully signed)], to which the United States responded, [R. 216], and Defendant replied, [R. 226]; Defendant's Motion for Reconsideration of the Court's May 4, 2026 Order Denying Motion to Continue Sentencing (DN 222), [R. 235]; Defendant's Motion for Reconsideration of the Court's May 5, 2026 Order Denying Motion for Evidentiary Hearing on Motion to Withdraw Guilty Plea (DN 233), [R. 236]; Defendant's Motion for the Court to Reject the Rule 11(c)(1)(C) Plea Agreement Under Rule 11(c)(3)(A) Based on Material Guideline Misapplication, and to Permit Withdrawal of Plea Under Rule 11(c)(5)(B) and Rule 11(d)(2)(A), [R. 237]; and Defendant's Motion for Leave to File Supplemental Sentencing Memorandum Out of Time, [R. 244]. For the reasons that follow, the Court will deny each of Defendant's pending motions except his Motion

---

[1] The Court held oral argument on these motions on May 7, 2026. [R. 247, p. 1]. The Court entered its oral ruling on these motions at that time, *see id.*, and now follows up with this written order.

- 1 -

for Leave to File Supplemental Sentencing Memorandum Out of Time, [R. 244], which the Court will grant for the reasons stated on the record at the sentencing hearing.

## I.    BACKGROUND

In June of 2024, nearly two years ago, Defendant was indicted by a federal grand jury on seven felony counts for money laundering and obstruction of justice. [R. 1]. The Indictment charges a lengthy conspiracy reaching back a decade, from 2016 to 2023, to launder the proceeds from Defendant's drug trafficking activities. *Id.* at 1. It also charges falsification of records in a federal investigation with the intent to hinder both the underlying criminal investigation and asset forfeiture proceedings. *Id.* at 8–9. The Court granted multiple trial continuances and held three pretrial conferences leading up to the scheduled trial on Monday, February 9, 2026. *See* [R. 32]; [R. 40]; [R. 56]; [R. 86]; [R. 101]; [R. 150]; [R. 158]; [R. 175]. Late on the evening of February 5, 2026, Defendant filed a motion for change of plea, [R. 176], which was granted, [R. 177], and Defendant pleaded guilty to all seven counts on Friday, February 6, 2026, just three days before his scheduled 2-week trial, [R. 181]. His plea was pursuant to a written plea agreement. [R. 183]. Specifically, the parties entered a "C Plea" pursuant to Rule 11(c)(l)(C) of the Federal Rules of Criminal Procedure, agreeing to a sentence of 96 months' incarceration and the forfeiture of certain real and personal property. *Id.* According to the United States, the plea agreement "allowed Defendant to keep significant real and personal property that would have otherwise been subject to criminal forfeiture." [R. 216, p. 2]. The Court accepted Defendant's guilty plea after finding it to be a knowing and voluntary and made with the advice of counsel. He was fully apprised of his constitutional rights, and he knowingly and voluntarily waived his rights, including his right to a jury trial, and entered a guilty plea to all counts. The Court set Defendant's sentencing hearing for May 7, 2026. [R. 181].

On April 27, 2026, eighty days after the change of plea hearing, Defendant filed several pro se motions, including a motion to withdraw guilty plea. [R. 199]; [R. 207 (re-filed fully signed)]. The United States responded to the motion, [R. 216], and Defendant replied, [R. 226]. The motion is ripe for review.

Before turning to the motion to withdraw, the Court will provide background on several additional pro se motions Defendant recently filed and the disposition of each. Related to his motion to withdraw, Defendant also filed a Motion for Evidentiary Hearing. [R. 228]. The Court denied that motion, [R. 233], and Defendant has since filed a Motion for Reconsideration of the Court's May 5, 2026 Order, [R. 233], Denying Motion for Evidentiary Hearing on Motion to Withdraw Guilty Plea, [R. 236]. The Court will address this reconsideration motion below. *See infra* Section II.B.

Defendant also filed a Motion to Continue Sentencing. [R. 197]; [R. 205 (re-filed fully signed)]. The United States responded in opposition, [R. 214], and the Court denied that motion, [R. 222]. After the Court entered its order, Defendant replied, [R. 225], and the Court entered another order, [R. 233], noting that Defendant's reply did not impact the Court's ruling:

> The Court has reviewed that reply, and it does not impact or change the Court's May 4, 2026 order entered yesterday, [R. 222], that denies his motion to continue his sentencing. Accordingly, Defendant Joseph Lanham's sentencing hearing remains as scheduled for May 7, 2026, per the terms of the Court's May 4, 2026 order, [R. 222]; *see also* [R. 229 (advancing oral argument to 1:00 PM on May 7, 2026)].

[R. 233]. Defendant has since filed a Motion for Reconsideration of the Court's May 4, 2026 Order, [R. 222], Denying Motion to Continue Sentencing. [R. 235]. The Court will address this reconsideration motion below. *See infra* Section II.C.

Defendant filed a pro se Motion for the Court to reject the Rule 11(c)(1)(C) Plea Agreement Under Rule 11(c)(3)(A) Based on Material Guideline Misapplication, and to Permit Withdrawal

of Plea Under Rule 11(c)(5)(B) and Rule 11(d)(2)(A). [R. 237]. The Court will address that motion below. *See infra* Section II.D.

Defendant also filed two additional pro se motions that the Court referred to Magistrate Judge Lindsay. Specifically, Defendant filed a Motion to Proceed Pro Se, [R. 196]; [R. 204 (re-filed fully signed)], and a Motion for *Faretta* Hearing, [R. 223]. Relatedly, Defendant's counsel filed a Motion to Withdraw as Attorney, [R. 218], which was also referred to Judge Lindsay. On Monday, May 4, 2026, Judge Linsday held a nearly 90-minute hearing on the referred motions. This Court requested and reviewed the transcript from the hearing. During the hearing, Judge Lindsay conducted a detailed and thorough *Faretta* hearing, in which he, among other things, advised Defendant of the charges and penalties and warned Defendant of the risks of pro se representation. [*Faretta* Tr., pp. 25–27, 32–33, 35]; [R. 238]. After being fully apprised of his rights and warned of the risks of pro se representation, Defendant knowingly waived his right to counsel and elected to proceed pro se. [*Faretta* Tr., p. 35]; [R. 232 (Waiver of Right to Counsel)].

Judge Lindsay followed the hearing with an Order. [R. 238]. First, as to Defendant's Motion to Proceed Pro Se, [R. 196]; [R. 204 (re-filed fully signed)], Judge Lindsay granted the motion to the extent that it requested current counsel, Mr. Shunnarah, be removed and Defendant be allowed to represent himself. *Id*. at 3. Judge Lindsay denied the motion insofar as Defendant requested appointed, standby counsel. *Id.* at 2 n.1. At Defendant's request, the Court permitted his former retained counsel, Mr. Shunnarah, to remain in the capacity of retained standby counsel. *Id.* at 3. The Court cautioned Defendant, however, that "standby counsel has a limited and defined role and that while standby counsel will be permitted to advise [Defendant], standby counsel will not be permitting to take over the defense of the case or make any arguments on [Defendant's] behalf." *Id.* Retained counsel's motion to withdraw, [R. 218], was granted; "[h]owever, as

- 4 -

requested during the hearing [by Defendant], Shunnarah shall be retained standby counsel for [Defendant] going forward." *Id.* at 4. Finally, Defendant's Motion for a *Faretta* hearing was granted, and the Court conducted a full *Faretta* hearing at that time. *Id.*

Finally, the Defendant filed a Motion for Leave to File and Receive Service Electronically through CM/ECF. [R. 198]; [R. 206 (re-filed fully signed)]. The Court denied Defendant's motion without prejudice, since no ruling had been made yet on his motion to proceed pro se. [R. 212]. The Court further referred any new motion (completed on the proper form) to Judge Lindsay, pending the outcome of the May 4, 2026, hearing. *Id.* In the meantime, the Court directed the Clerk to send all filings in the case to Defendant at his registered e-mail address, [R. 211], and the Court has received no complaints from Defendant in this regard. Based on Defendant's motion practice, it is clear he is receiving all filings. Moreover, at Defendant's hearing before Judge Lindsay, he made no follow-up request for ECF access, nor did he tender the completed Court-approved form with which he was previously provided in order to request such access.

Having briefly reviewed Defendant's motions that were referred to and resolved by Judge Lindsay, the Court will now consider Defendant's outstanding pending motions.

## II.   ANALYSIS

### A.   Defendant's Pro Se Motion to Withdraw Guilty Plea Pursuant to Federal Rule of Criminal Procedure 11(d)(2)(B), [R. 199]; [R. 207 (re-filed fully signed)]

Under Federal Rule of Criminal Procedure 11(d)(2)(B), "[a] defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if: . . . the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). When determining whether to grant a motion to withdraw a plea of guilty, district courts consider seven non-exhaustive factors:

(1) the amount of time that elapsed between the plea and the motion to withdraw it;
(2) the presence (or absence) of a valid reason for the failure to move for withdrawal

earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

*United States v. Bell*, 795 F. App'x 398, 402 (6th Cir. 2019) (citations omitted). This list represents a "general, non-exclusive list," with no single factor controlling. *United States v. Simmons*, 794 F. App'x 461, 466 (6th Cir. 2019) (citation omitted). "[T]he government is not required to establish prejudice" under the seventh factor "unless and until the defendant advances and establishes a fair and just reason for allowing the withdrawal" under the first six. *Bell*, 795 F. App'x at 402. Further, "[t]he relevance of each factor will vary depending on the circumstances surrounding the entry of the plea and the motion to withdraw it." *United States v. Lewis*, 800 F. App'x, 353, 357 (6th Cir. 2020).

The standard of review for denial of a motion to withdraw a guilty plea made between the plea and sentencing is abuse of discretion. *Bell*, 795 F. App'x at 402. The Sixth Circuit has repeatedly articulated the purpose of the rule:

This rule is designed to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes he made a bad choice in pleading guilty. When a defendant has entered a knowing and voluntary plea of guilty at a hearing at which he acknowledged committing the crime, the occasion for setting aside a guilty plea should seldom arise. That is so because the withdrawal of a guilty plea is inherently in derogation of the public interest in finality and the orderly administration of justice.

*Simmons*, 794 F. App'x at 466 (internal citations and quotation marks omitted) (citing *United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir. 1991); *United States v. Ellis*, 470 F.3d 275, 280 (6th Cir. 2006)).

1.  Length of Delay

The first *Bell* factor is the amount of time that elapsed between the plea and the motion to withdraw it. *Bell*, 795 F. App'x at 402. "The shorter the delay, the more likely a motion to withdraw will be granted, and a defendant's reasons for filing such a motion will be more closely scrutinized when he has delayed his motion for a substantial length of time." *United States v. Triplett*, 828 F.2d 1195, 1197 (6th Cir. 1987). Here, Defendant moved to withdraw his guilty plea over eleven (11) weeks (80 days) after he pleaded guilty. *See* [R. 181]. His change of plea occurred on February 6, 2026, [R. 181], and his initial motion to withdraw guilty plea was filed April 27, 2026, [R. 199]; [R.207 (re-filed fully signed on April 28, 2026)]. The Sixth Circuit has refused to permit the withdrawal of guilty pleas under similar circumstances. *See United States v. Spencer*, 836 F.2d 236, 239–40 (6th Cir. 1987) (refusing to allow a defendant to withdraw his guilty plea in part because he waited five weeks after entry to file his motion to withdraw); *United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994) (holding that six weeks constituted an inordinate delay); *see also United States v. Benton*, 639 F.3d 723, 727 (6th Cir. 2011) (collecting cases regarding the amount of delay and noting that "[t]his Court has declined to allow plea withdrawal when intervening time periods were as brief as one month")); *United States v. Martin*, 668 F.3d 787, 795 (6th Cir. 2012) (collecting cases regarding the amount of delay). This factor thus weighs heavily against withdrawal.

2.  Reason for Delay

As to the second factor, the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings, Defendant argues that the "operative date" for measuring his request to withdraw his plea is February 19, 2026, thirteen days post-plea, when he claims he first "demanded" that his retained counsel file the motion. [R. 207, pp. 7–8]. He asserts that

- 7 -

thereafter, he repeatedly requested his counsel to file such a motion, but counsel refused to act. *Id.* at 8–10, 14–16. In reply, he argues counsel's failure to do so constituted "constructive abandonment." [R. 226, p. 4]. Defendant therefore claims he did not "sleep on his rights." *Id.* In support, Defendant attaches various text messages with his counsel. [R. 199-4].

The United States responds that Defendant's professed "demand" that his counsel file a motion to withdraw his plea "lacks important context," particularly regarding whether Defendant's request was a true "demand" as well as the reason for Defendant's second thoughts about his plea deal. [R. 216, pp. 11–12]. The United States specifically noted that

> [b]etween February 6th and February 19th, Lanham had apparently become dissatisfied with the disposition of property subject to asset forfeiture, despite having negotiated an agreement that allowed him to keep his primary residence, a lakefront vacation home, a luxury speedboat, and other income-generating investment properties. His so-called "demand" for his counsel to move to withdraw his plea was contingent on the United States' response to his offer to retain additional properties for a fraction of their estimated value (an offer conveyed the same day by his counsel) and Lanham made no mention of medication or cognitive impairment. Instead, Lanham's expressed desire to withdraw his plea was based on a transparent desire to renegotiate the property agreement he previously bargained for.

*Id.*

The texts submitted by Defendant himself belie his claims and support the United States' position. [R. 199-4]. First, the texts reflect Defendant did not "demand" his counsel file a motion to withdraw his plea on February 19, 2026, but rather, they demonstrate his request was conditional; in other words, the motion would be filed sometime in the future only if counsel was unsuccessful in negotiating a better deal. *Id.* at 2–3. Second, as relevant here and to the fourth *Bell* factor, *see infra*, the texts demonstrate Defendant's true motivation in seeking to withdraw his plea was not because he suffered any cognitive issues or was coerced, but rather because he became dissatisfied post-plea with the deal he made and wanted to renegotiate it. The texts on February 19, 2026, provide:

- 8 -

I been going through this evidence I'm finding so much to prove my innocence. They might have me on drug trafficking but not no [sic] money laundering. I need you to find out about that money judgment to keep the properties or I'm wanting to prove it at trial. I just ain't felt right after finding all this evidence about the indictment. Them cops lied so much and they are stealing so much from me. *Get on top of that money judgment for me. If no response, I want to withdraw my plea before it goes further. . . . I need you to get hold of them and get this worked out for me.*

[R. 199-4, pp. 2–3 (emphasis added)].

Additionally, although Defendant cites to *Maples v. Thomas*, 565 U.S. 266 (2012) as a purportedly analogous case supporting his motion to withdraw, [R. 199, pp. 15–16], *Maples* addressed an argument concerning procedural default in the post-conviction context of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), not arguments concerning an attorney's purported abandonment in the pre-conviction context. *See* 565 U.S. at 289 (determining that the petitioner established cause sufficient to excuse his procedural default).

Taken together, the record is clear. As to Defendant's alleged first "demand" to counsel on February 19, 2026, Defendant's request was expressly *not* a demand; rather, it was conditional: "*If no response* I want to file a motion to withdraw my plea before it goes any further." [R. 199-4, p. 3 (emphasis added)]. As the United States argues and the texts bear out, Defendant was attempting to renegotiate the terms of his binding plea agreement, and his clear instruction to counsel was conditional on the United States' response. Regardless of the underlying reason, the record is clear that he made no unequivocal request on February 19, 2026, for counsel to file a motion to withdraw his plea. Defendant's next arguable request for counsel to file such a motion did not occur until March 11, 2026—over a month after his plea—where he texted his counsel "I need you to file a motion to withdraw my plea." [R. 199-4, p. 20].

Giving Defendant the great benefit of the doubt, the earliest date he even arguably made a direct request to counsel to file the motion was March 11, 2026, over a month after his plea.

Further, the record reveals Defendant has substantial resources and ingenuity, and could have easily fired his retained counsel and hired new counsel to timely file his motion. Or, as he did eventually, Defendant could have filed a pro se motion much sooner, rather than wait until eleven weeks after his plea. This factor weighs heavily against Defendant. And, regardless, even if the Court accepted Defendant's earliest date on which he claims to have "demanded" counsel to file the motion—February 19, 2026—then this factor would be neutral or, at best, tilt only slightly in Defendant's favor. Given the strength of the other factors discussed below, which weigh decidedly against the motion, this single slight factor would fail to change the outcome.

In further support of his argument as to the second factor, Defendant claims his delay was due to his counsel having a professed conflict of interest which delayed the filing of the motion. [R. 207, pp. 2–3, 9–10, 15]. Again, Defendant attaches texts beginning on April 10, 2026, between himself and his counsel, wherein his counsel responded for the first time that he could not file the motion to withdraw because he (i.e., counsel) would potentially be a witness. And, as far as timing, the first discussion regarding this potential conflict occurred on April 10, 2026, over two months *after* Defendant's plea. Interestingly, in the texts Defendant filed in the record, his counsel explains the genesis of the conflict, stating "I was your attorney when you entered the plea. If I believed something was wrong, I would have told the federal judge before entering the plea." [R. 199-4, p. 11]. As explained further below, Defendant has manufactured arguments and evidence to support his alleged "cognitive impairment" position, which then forms the basis of his conflict of counsel arguments. *See infra* Section II.A.4. To allow Defendant to manufacture grounds for conflict with counsel and then to permit Defendant to withdraw his guilty plea based on that conflict would be to upend justice. Defendant's argument is wholly unavailing.

    3.   Assertion of Innocence

The third *Bell* factor is "whether the defendant has asserted or maintained his innocence." *Bell*, 795 F. App'x at 402. The Sixth Circuit has recognized that "'vigorous and repeated protestations of innocence' may support the decision to allow withdrawal of a guilty plea." *United States v. Carpenter*, 554 F. App'x 477, 482 (6th Cir. 2014) (quoting *United States v. Baez*, 87 F.3d 805, 809 (6th Cir. 1996)). In the instant case, Defendant "does not . . . assert categorical innocence," though he vaguely distances himself from some of the specific facts to which he admitted as part of his Plea Agreement. [R. 207, p. 17]. That is, no "vigorous and repeated protestations of innocence" are at play here. To the contrary, Defendant, speaking under oath, agreed to the factual basis contained in his plea agreement. [R. 239, p. 45]. Defendant openly and voluntarily admitted, under penalty of perjury and after being found competent to enter a guilty plea, to being guilty on all counts of the Indictment. *Id.* The Court has absolutely no concerns in this regard. Statements of guilt under oath at a plea hearing weigh against withdrawal. *United States v. Martin*, 668 F.3d 787, 796 (6th Cir. 2012). This factor weighs decidedly against withdrawal.

    4.   Circumstances Underlying the Plea

The fourth *Bell* factor is "the circumstances underlying the entry of the guilty plea." *Bell*, 795 F. App'x at 402. "[A] defendant's statements at a plea hearing are regarded as conclusive as to truth and accuracy in the absence of a believable, valid reason justifying a departure from the apparent truth of those statements. And a defendant is bound by his statements made at the plea hearing that he was not threatened or forced in any way to plead guilty." *Lewis*, 800 F. App'x at 358 (internal quotation marks and citations omitted). This Court conducted an extensive and detailed colloquy under Federal Rule of Criminal Procedure 11 to ensure Defendant's plea was

knowing and voluntary. The Court informed Defendant of, among other things, his right to a jury trial, his right to confront witnesses against him, and his right to counsel and informed him that he would waive these rights by pleading guilty. *See* [R. 239, pp. 8–11] Nevertheless, Defendant articulates two grounds for why he believes he should be allowed to withdraw his guilty plea. The Court will consider his stated grounds in turn.

### a. Cognitive Impairment

Defendant's first argument addressing the circumstances underlying the withdrawal of his plea is that he was cognitively impaired during the plea hearing due to his abuse or "combined use" of various substances, including prescription baclofen (a muscle relaxant), alcohol, and various over the counter medications, including Benadryl and NyQuil. [R. 207, pp. 2, 4–5, 7–8, 12–13]. In support, Defendant attaches medical records from two visits with health care professionals in March 2026 that he claims substantiate his cognitive impairment. *Id.* The first is from Nurse Lamaster. [R. 207, pp. 2, 7, 12]; [R. 199-1]. In his motion, Defendant states that Nurse Lamaster's "clinical assessment" found that Defendant's "impairment was '[s]ignificant enough to affect decision-making in court and noticed by family members.'" [R. 207, p. 2]. This wholly misrepresents Lamaster's assessment. The portion of her report in which she makes the statement that his alleged impairment was "[s]ignificant enough to affect decision-making in court and noticed by family members" is in the "history of present illness" section. *See* [R. 199-1, p. 2]. That section is clearly a summary of Defendant's *self-reported* symptoms—that is, it summarizes the symptoms that Defendant reported to Lamaster; it is *not* a summary of her own observations, nor is it her diagnosis or assessment. Instead, in the "Visit Diagnoses" section of her report, her primary diagnosis is listed only as "mild cognitive impairment of unknown etiology." *Id.* at 10.

Next, Defendant cites the medical notes of Sarah Parsons, DO, dated March 7, 2026 (with a March 10, 2026 addendum). *See* [R. 199, p. 8]. However, these notes are not helpful to Defendant's position. In her Mental Status Exam ("MSE") notes, Dr. Parsons states that Defendant displayed signs of anxiety and regret, but his thought process was "logical and goal-directed," he showed no signs of delusions, hallucinations, or suicidal ideation, he reported no perceptual disturbances, and he was alert and oriented to person, place, and time. [R. 199-2, p. 4]. She also reported that Defendant "demonstrated good insight into his substance use and its impact on his decision-making" and his judgment "appeared intact, as evidenced by his efforts to seek help and address his legal and mental health concerns." *Id.* Her ultimate diagnosis was "Anxiety Disorder (ICD-10 F41.9), Alcohol Use Disorder (F10.20) in remission, and Substance Use Disorder (F11.20) in remission." *Id.*

The United States argues the medical reports and any accompanying diagnoses are "based solely on [Defendant's] own representations to the providers." [R. 216, p. 14]. The United States further notes that Defendant escalated his reported drug abuse between his visit on March 3, 2026, with the nurse, and his visit on March 7, 2026, with the psychiatrist, to "escalate and exaggerate his claims in order to make his assertion of impairment more convincing." [R. 216, p. 14]. In reply, Defendant contends the medical diagnosis were corroborative, that he had no incentive to fabricate his cognitive impairment, and that the United States' arguments are conclusory. [R. 226, pp. 5–9].

As mentioned, Defendant misrepresents the medical records where he claims that Nurse Lamaster concluded his impairment was "[s]ignificant enough to affect decision-making in court and noticed by family members." [R, 207, p. 2]. No such finding was made by the nurse; this was Defendant's own *self-reporting* to the nurse, not a finding or diagnosis by Nurse Lamaster. Together the health care professionals diagnosed Defendant with relatively mild diagnoses: "*Mild*

- 13 -

cognitive impairment of unknown etiology," [R. 199-1, p. 10 (emphasis added)], and "Anxiety Disorder (ICD-10 F41.9), Alcohol Use Disorder (F10.20) in remission, and Substance Use Disorder (F11.20) in remission." [R. 199-2, p. 4]. Given the unremarkable nature of the diagnoses, none of them, either singly or in combination, substantiate that Defendant was cognitively impaired a month earlier during his plea colloquy, or suggest that even if he was suffering from such disorders on the day of this plea, they would have impacted his ability to enter into a knowing and voluntary plea.

Even more, the Court thoroughly evaluated Defendant's affect, competency, and mental health condition at his plea hearing, and specifically inquired about any medications he was taking, asking him in detail about each of these issues. [R. 239, pp. 4–6]. The Court provided Defendant and defense counsel ample opportunity to voice any concerns about Defendant's mental health and any related issues, and they convincingly denied any such concerns:

> THE COURT: Are you under the influence of any kind of drugs or alcohol today?
> THE DEFENDANT: No, Judge.
> THE COURT: What about prescription medicine?
> THE DEFENDANT: Just health stuff; Metformin, heart -- acid reflux medicine, but that's it.
> THE COURT: Okay. Are you taking any kind of medicines that might interfere with your ability to focus or concentrate or understand what's happening today?
> THE DEFENDANT: No, Judge.
> THE COURT: All right. Have you ever been treated for addiction to drugs or alcohol?
> THE DEFENDANT: I've taken a few classes in the past; marijuana.
> THE COURT: All right. Have you -- was that, I guess outpatient, not inpatient?
> THE DEFENDANT: Outpatient.
> THE COURT: All right. And have you ever been diagnosed with any kind of mental illness or disorder?
> THE DEFENDANT: No, Judge.
> THE COURT: All right. Ever been treated or hospitalized for any kind of mental illness or emotional problem?
> THE DEFENDANT: No, Judge.
> THE COURT: Anything going on with you today that might impact your ability to think clearly or understand what's happening?
> THE DEFENDANT: No, Judge.

> THE COURT: All right. Mr. Shunnarah, have you had any problems communicating with your client today or at any point?
> MR. SHUNNARAH: Not at all, Judge.
> THE COURT: Has he understood your legal advice?
> MR. SHUNNARAH: I believe so. Yes, ma'am.
> THE COURT: And participated in the defense of his case?
> MR. SHUNNARAH: Yes, ma'am.
> THE COURT: Any concerns about his competency?
> MR. SHUNNARAH: No, ma'am.
> THE COURT: Nor do I. Then based upon Mr. Lanham's answers to my questions and the representations of his counsel, I find that he's competent to plead guilty to the charges against him in the indictment.

[R. 239, pp. 6–7].

Moreover, and again, even accepting the proffered diagnoses as accurate, the undersigned was present and conducted Defendant's entire plea hearing. The Court held a detailed and involved plea hearing, throughout which the Court engaged with Defendant for an hour and a half. Defendant showed *absolutely no signs* of cognitive impairment; he did not slur his speech; he was not sleepy or lethargic; he did not hesitate or struggle with his words or responses; his thought process was clear; he understood the content and context of every single question without the need for repetition or clarification. Indeed, he was engaged, nimble-minded, alert, inquisitive, exceedingly aware of the issues, and asked appropriate, intelligent, and detailed questions. In fact, the Court commented on Defendant's abilities and his grasp of the issues:

> THE COURT: [Defendant is] clearly a very bright person and is asking lots of good questions and I believe I have addressed those questions. So you understand again, Mr. Lanham, how that (c) plea works?
> THE DEFENDANT: Yes, Judge.

[R. 239, p. 35]. The notion that Defendant took "10 muscle relaxers on the morning of February 5th, [drank] a significant amount of tequila that night (on the eve of his plea), and then [took] 10 muscle relaxers, four 'drinks' of Nyquil, and a couple of Benadryl on the morning of February 6th before changing his plea," [R. 199-5], is downright preposterous. The Court was present and

attentive for the entire plea hearing. The Court has *absolutely zero concern* that Defendant was cognitively impaired.

Before moving on to Defendant's next rationale for withdrawing his plea, the Court credits additional argument made by the United States that bears on the true motivation for Defendant's motion to withdraw his plea. The United States highlights the timing of Defendant's alleged cognitive impairment. The United States notes that his initial texts with his counsel on February 19, 2026, included no mention of his alleged cognitive impairment concerns and instead focused on the real issue: Defendant's attempt to renegotiate the property disposition in his plea agreement. [R. 26, pp. 2–4]. Based on the text messages Defendant filed, the first time he mentioned his cognitive impairment to counsel was February 27, 2026. [R. 199-4, p. 4]. Notably, this text was sent about a week after the United States declined to renegotiate the property disposition of the plea agreement. [R. 216, p. 4]. And later texts reflect Defendant's continued efforts to renegotiate the forfeiture provisions. *Id.*; [R. 199-4, pp. 4–5]. The United States argues that between this and the dubious affidavits discussed below, it is clear Defendant manufactured his cognitive impairment argument when he was unsuccessful in renegotiating the terms of an agreement he had soured on. [R. 216]. The Court agrees.

Moving on to the affidavits submitted by family and friends in support of his motion, which include claims such as "witness[ing] [Defendant] take 10 muscle relaxers on the morning of February 5th, drink a significant amount of tequila that night (on the eve of his plea), and then take 10 muscle relaxers, four 'drinks' of Nyquil, and a couple of Benadryl on the morning of February 6th before changing his plea," [R. 199-5], the United States notes that as with other affidavits Defendant submitted to the Court during the case,

> all but one of the five affidavits provided . . . appear to be written in the same handwriting, which appears to be Lanham's handwriting based on lay comparison.

All were dated over the course of a few days leading up the filing of Lanham's motion to withdraw on April 27, 2026 and were purportedly signed by Lanham's family and friends, whose objectivity and credibility would be questionable at best. In addition to the dubious affidavits that Lanham has previously disclosed to the United States and the Court in his defense, the evidence against Lanham includes multiple examples of forged and fabricated documents, including the falsified boat claim that is the subject of Counts 6 and 7 of the Indictment.

[R. 216, p. 15].

The Court harbors the same concerns as the United States related to the self-serving affidavits, written largely in the same handwriting, by family and friends (one of whom is an indicted co-defendant, his mother) and others who were involved. [199-5]; [R. 194]. Further, as the United States notes, Defendant pled guilty in Counts 6 and 7 to obstructive behavior involving a falsified claim and admitted to using quitclaim deeds and other documentary shenanigans to advance his money laundering scheme. As noted by the United States, similar self-serving and dubious affidavits have been tendered previously by Defendant in this case, all of which point to Defendant's continuing pattern of obstructive behavior. [R. 107-1]; [R. 62-2].

### b. Involuntary Plea/Coercion

Defendant further argues that his "wired" plea was not the product of his "free will" because "[o]n March 20, 2026—approximately six weeks after the plea—Defendant sent a text message to current counsel stating: 'They threatened my mom and her house.'" [R. 207, pp. 13, 14]. Defendant continues, stating he was under undue pressure to plead guilty because "his mother's home and her own criminal exposure were being leveraged to secure a global resolution of the case." *Id.* at 6. He invites the Court to compare the forfeiture allegations in the Indictment with his Plea Agreement and contends that a guilty plea made in consideration of lenient treatment for a family member poses a greater danger of coercion.

The United States counters that there are two flaws with Defendant's coercion/wired plea agreement argument: "1. There are no inconsistencies between the initial forfeiture allegation in the Indictment and the plea offer made by the United States; and 2. Joseph Lanham introduced the 'wired' plea agreement by seeking dismissal of the charges against his mother as a condition of his own guilty plea." [R. 216, p. 16]. The United States points out that while the forfeiture allegation in the Indictment, which applies to Defendant and Ms. Lanham, lists specific property subject to forfeiture, it clearly applies to a broad category of property, including "any and all of the defendants' property constituting, or derived from [criminal] proceeds" and property "used . . . to commit or . . . facilitate the offenses and property involved therein" [R. 216, pp. 16–17]; [R. 1]. By this, the United States appears to argue that Ms. Lanham's house was never expressly "off the table" as a potentially forfeitable property.

The United States further contends that Defendant's argument that he felt mounting pressure to enter a guilty plea because the United States entangled his and his mother's fates in a "wired" plea is "a complete distortion of reality." [R. 216, p. 17]. The United States contends, and Defendant does not dispute, *see* [R. 226, p. 8], that it was Defendant who first suggested a global settlement asking that the charges against her be dismissed in exchange for his plea, with the United States countering a contingent offer of pretrial diversion for Ms. Lanham, [R. 216, p. 17]. Moreover, as the United States notes, the documents attached to Defendant's motion reflect that the United States agreed *not* to seek forfeiture of Ms. Lanham's residence at Johnsontown Road. [R. 199-6, p. 4]. In reply, Defendant repeats his same arguments, claiming the coercive effect of such a "wired" plea and citing *United States v. Caro*, 997 F.2d 657, 658–60 (9th Cir. 1993); *United States v. Pollard*, 959 F.2d 1011, 1021–22 (D.C. Cir. 1992). *See also* [R. 207, p. 6 (citing *United States v. Usher*, 703 F2d 956, 958 (6th Cir. 1983); *Bordenkircher v. Hayes*, 434 U.S. 357, 364–65

- 18 -

(1978))]. Defendant argues he was "forced" to sacrifice his liberty "to spare (his mother's home and freedom)." [R. 226, p. 8]. Defendant's arguments are unconvincing.

First, as to any pressure or "threats" referenced in his March 20, 2026 text to counsel, anything of this nature occurred over a month *after* Defendant already pleaded guilty, so it is impossible it could have impacted his plea on February 6, 2026. The record is clear that at the time Defendant pled guilty, no deal had been finalized with Ms. Lanham. [R. 181]; [R. 182]. In any event, at Ms. Lanham's status conference following Defendant's plea, her counsel and the prosecutors advised the Court that they were in the process of negotiating a pretrial diversion agreement. [R. 182]. No such agreement has been entered, and in fact, Ms. Lanham appears to be pressing her right to a jury trial instead of accepting pretrial diversion. [R. 195]; [R. 203]. At the May 7, 2026 status conference held for Ms. Lanham, her counsel confirmed that pretrial diversion was offered and the United States made Ms. Lanham's requested revisions, but nevertheless she expressed her desire to proceed to trial. *See* [R. 253].

Moreover, if anything, the record reveals that it was *Defendant*, not the United States, who insisted on linking his plea agreement with her pretrial diversion agreement. *See* [R. 216, p. 17 (noting that it was Defendant who first suggested "seeking dismissal of the charges against Laura Lanham as a condition of his plea" and that "[t]he contingent offer of pretrial diversion extended to Laura Lanham by the United States was in direct response to [Defendant's] insistence that the disposition of her case be a key term of his own plea agreement")]. To the extent Defendant specifically linked his plea with leniency for his mother—and Defendant does not refute this was his idea—Defendant is a smart, adept businessman who was represented at all times by able counsel, and the record he personally supplied regarding his negotiations with the United States belies any argument that he was forced or pressured to enter a plea.

- 19 -

And, more to the point, the Court thoroughly covered the voluntariness of Defendant's plea

and ensured he was not laboring under any coercion:

> THE COURT: So next, Mr. Lanham, I have to ensure that your plea is voluntary.
> Has anyone threatened you or anyone close to you or forced you in any way to
> plead guilty?
> THE DEFENDANT: No, Judge.
> THE COURT: Is it your choice to plead guilty?
> THE DEFENDANT: Yes, Judge.
> THE COURT: Have any promises been made to get you to plead guilty other than
> what's in your plea agreement?
> THE DEFENDANT: No, Judge. Other than the state situation, Judge.
> THE COURT: Right. We've talked about that and this plea is not binding on that.
> Do you understand?
> THE DEFENDANT: I do, Judge.
> THE COURT: So then based upon Mr. Lanham's answers to my questions and the
> representations of his counsel, I find that he understands the plea agreement he's
> entering into and that the plea is voluntarily made.

[R. 239, pp. 35–36].

One final observation concerning Defendant's claimed coercion and the specific questions

he raised during his plea colloquy about the terms of his plea agreement. During the hearing,

Defendant raised specific questions about two issues, neither of which concerned the disposition

of his mother's case or the supposed "wired" nature of his case with his mother's case. Once again,

Defendant's focus was on the money and the property. First, Defendant wanted to ensure the terms

of the agreement had been revised to reflect the release of a boat upon his payment of $50,000 and

that the balance of the $150,000 he had agreed to pay would be made "as he was able," rather than

the previous version that required $10,000 per month for fifteen months:

> THE COURT: Mr. Lanham, did you hear and understand what the prosecutor said
> about the terms of your plea agreement?
> THE DEFENDANT: I did, Judge, but one thing. When I pay the $50,000 certified
> check to them, I get the boat released to me.
> THE COURT: Yeah. She went over that.
> THE DEFENDANT: Okay. And then also the 150,000. They got in there that I pay
> 10,000 per month, but we agreed that –
> THE COURT: No. That's –

THE DEFENDANT: As I'm able to pay it.

MS. KEEL: They're looking, I think, at an old copy.

THE DEFENDANT: I want to make it clear on the record is what I'm asking to do.

THE COURT: Yes. What I said was an earlier version that I had had 15 payments of 10,000 apiece, but the new and final plea agreement says "as able." I presume, is there a back end on that, like, the end of his supervised release or -- there is no back end on that? It's just the United States would then choose to move forward with the lis pendens, potentially?

MS. KEEL: Well, the lis pendens would remain.

THE COURT: Yes, I understand. On the real property, not on the boat. The boat is all released and the trailer after the $50,000 is paid.

MS. KEEL: That's right. And so the -- and I actually -- when I sent our agreement to the court, that was one thing that verbally Mr. Shunnarah had expressed they had a concern about his ability to pay the $10,000 a month for 15 months; that he may not be able to come up with the money that quickly. And so rather than insert another specific payment plan in there, we just left it up to his "as able" to pay in installments and that lis pendens would then remain just until the 150 was paid.

THE COURT: Okay. So does that answer your question?

THE DEFENDANT: Yes, Judge.

[R. 239, pp. 24–26].

The other specific question Defendant raised concerned the release of property held by state prosecutors. Apparently, the state charged Defendant in a related matter, but dropped the charges without prejudice. As part of those proceedings, the state held certain property of Defendant. Defendant's counsel was working on an agreement with the state for its release, but the agreement had not yet been finalized at the time of his federal plea. During the hearing, Defendant attempted to link or "wire" his plea in this case with the disposition and release of his property in the state case, and the Court swiftly disabused him of that notion:

THE DEFENDANT: I did, Judge. One more thing on the record is that we're in a verbal agreement on the -- a state issue, that I was getting my belongings back, but I was forfeiting my bank money over but getting vehicles returned and I wasn't going to get indicted or anything -- any troubles with the state. I just want that on record; that we have a verbal agreement on that.

* * *

THE DEFENDANT: I understand it's a global resolution. I understand it's between me and the state, but -- but –

THE COURT: Ms. Keel even if she wanted to cannot agree to force the state to do anything at all, so this plea is not contingent on any kind of state proceeding.

THE DEFENDANT: Even with Mr. Pribble -- sorry, Judge. With him here, if he agrees to this –

THE COURT: He doesn't control the state prosecutor either. So it sounds like maybe you all have worked that out, but Ms. Keel or the court or anybody else can't control what the state prosecutor does. Oftentimes when somebody is prosecuted in federal court and receives, you know, a sentence there, they will dismiss their charges. That happens routinely. It sounds like Mr. Shunnarah has been laying the groundwork for all of that and it sounds like maybe the state has informally agreed to that, but your plea here is not contingent on that because none of us can control that. Do you understand?

THE DEFENDANT: Yes, Judge.

THE COURT: So you used this word "global resolution." There is no global resolution in this court. You might have a global resolution that you've also, you know, made an agreement with the state prosecutor, but this plea has nothing to do with that.

THE DEFENDANT: Yes, Judge.

THE COURT: We can't bind them. Even if we wanted to, we can't bind them or control them. Do you understand that?

THE DEFENDANT: I do, Judge.

*Id.* at 26, 27–28.

Notably, when Defendant raised the state negotiations again later in the hearing, the Court again made clear to Defendant that his plea was not contingent on any other agreement, and he assured the Court he was not under any type of coercion or mental incompetence:

THE COURT: But, I mean, that's -- I'm just repeating what the lawyers have said. So, again, I can't promise you anything. I think you should listen to your counsel who's been through these things before and knows how they operate. And so, you know, I think you should listen to his advice, but I can't, you know –

THE DEFENDANT: I trust my lawyer and I trust Ms. Keel at her word as well, so I'll move forward. Sorry. I apologize. I do not mean to -- I know your time's valuable and everybody's time's valuable here.

THE COURT: I get it. I get it.

MR. SHUNNARAH: Judge, let me just express that *I believe Mr. Lanham is nervous. I think he's aware of what he's doing here today. I don't think he suffers from any incompetence or –*

THE DEFENDANT: *Nothing like that, Judge.*

THE COURT: I know that. Yeah, I know that. And, look, you're asking good questions and that's -- you know, that's your right and I want to answer your questions. We're all trying to answer all your good questions to the degree that we're able, you know, to do that.

[R. 240, pp. 3–4 (emphasis added)].

The record makes clear that Defendant asked numerous thoughtful questions about the disposition of his property and money in this case and about his negotiations with state prosecutors concerning the return of certain property. The Court patiently answered his questions and made clear that his plea was not contingent on any agreement with the state for the return of certain property, or anything else. During the entire plea hearing, which lasted nearly 90 minutes and during which Defendant actively asked detailed questions about the terms of his agreement, not once did Defendant ask any questions or raise any concerns about the "wired" nature of his plea and the disposition of his mother's case. Not a single time.

One final argument merits addressing. In his reply, Defendant argues a "structural conflict" existed because Patrick Renn, counsel for Defendant's mother, along with Alex Dathorne and his own counsel all recommended that Defendant enter his plea. [R. 226, p. 13]. He then notes that Mr. Renn's loyalty lies with Defendant's mother, and that such is "a textbook structural conflict in the joint-representation sense." *Id.* (citing *Wheat v. United States*, 486 U.S. 153, 160 (1988); *Cuyler v. Sullivan*, 446 U.S. 335, 348–50 (1980); *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978)). This argument is meritless.

Joint representation occurs when a single attorney is "requir[ed] or permit[ted] . . . to represent codefendants." *Holloway*, 435 U.S. at 482. Although joint representation "is not *per se* violative of constitutional guarantees of effective assistance of counsel," *id.*, it does "engender[] special dangers of which a court must be aware." *Wheat*, 486 U.S. at 160. For example, "a conflict [of interest] may . . . prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by

emphasizing that of another," among other examples. *Holloway*, 435 U.S. at 490. Due to these risks, "a court confronted with and altered to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel." *Wheat*, 486 U.S. at 160.

Here, two key facts undermine Defendant's argument that "structural conflict" existed in his case due to joint representation. First, nothing in the record reflects that Patrick Renn, counsel for Defendant's mother, or Alex Dathorne formally or informally represented Defendant in this case. Even if Mr. Renn "recommended" that Defendant accept the plea offer presented to Defendant as Defendant alleges, *see* [R. 226, p. 13], a defendant must "show[] that *his* counsel actively represented conflicting interests" to establish ineffective assistance of counsel arising from joint representation, *Cuyler*, 446 U.S. at 350 (emphasis added), and Defendant nowhere alleges that Mr. Renn was *his* counsel. The same is true for Mr. Dathorne, as nowhere does Defendant allege Mr. Dathorne acted as *Defendant's* counsel in this case, *see generally* [R. 226]; indeed, Defendant's motion does not specify Mr. Dathorne's role at all, *see id.* at 13.

Second, nothing in the record reflects that any informal recommendations made to Defendant by Mr. Renn or Mr. Dathorne "did in fact render [Defendant's] plea in question involuntary and unintelligent." *Cuyler*, 446 U.S. at 349 (citation and quotations omitted). In *Dukes v. Warden*, the United States Supreme Court determined that a defendant's guilty plea—made on the advice of two lawyers, one of whom also represented the defendant's codefendants on an unrelated charge—was not rendered involuntary and unintelligent by the conflict of interest alleged by the defendant. 406 U.S. 250, 257 (1972). The Supreme Court found the lower court's reasoning persuasive, nothing that the defendant nowhere alleged and the record nowhere revealed that either attorney "induced [the defendant] to plead guilty in furtherance of a plan to obtain more favorable consideration from the court for other clients," or provided "misleading advice . . . which

- 24 -

led [the defendant] to plead guilty," *id.* at 256; further, that defendant was only represented by one attorney at the entry of his plea and represented during his plea that he was satisfied with that attorney's representation, *id.* at 257. Here, Defendant did not indicate at his plea hearing that he was dissatisfied with the representation provided by either Mr. Renn or Mr. Dathorne because, as the record reflects, Mr. Shunnarah was Defendant's his sole attorney both at that plea and throughout these proceedings. [R. 239, pp. 1–2, 11]. Therefore, both because Mr. Shunnarah was Defendant's sole attorney throughout these proceedings and because the record does not show Defendant's plea was involuntary or unintelligent, Defendant's argument fails.

For all the reasons already stated, Defendant is experienced and savvy when it comes to the criminal justice system, and he enjoyed the benefit of his own experienced, retained counsel. During Defendant's plea hearing, Defendant expressed that he was fully satisfied with the advice and counsel he received from Mr. Shunnarah. [R. 239, p. 11]. The record makes clear that he entered into a knowing and voluntary plea, devoid of any coercion, and his efforts to conjure up facts and arguments that do not exist falls flat.

Considered as a whole, this record reflects that the Court thoroughly covered Defendant's mental health, medications, and the voluntariness of his plea. At no point during the colloquy did Defendant or defense counsel raise any concerns about Defendant's capacity or the voluntary nature of his decision to plead guilty. Defendant cannot now argue that his plea was not entered knowingly or voluntarily, as "a defendant's statements at a plea hearing are regarded as conclusive as to truth and accuracy 'in the absence of a believable, valid reason justifying a departure from the apparent truth of those statements.'" *Lewis*, 800 F. App'x at 358 (quoting *United States v. Cinnamon*, 112 F. App'x 415, 419 (6th Cir. 2004) (per curiam)). After a thorough review of Defendant's motion and the accompanying attachments, and with the benefit of oral argument, no

such believable, valid reason exists here. "[A] defendant is 'bound by his statements made at the plea hearing that he was not threatened or forced in any way to plead guilty.'" *Id.* (quoting *Cinnamon*, 112 F. App'x at 419). Therefore, the circumstances of Defendant's plea hearing weigh heavily against granting the motion to withdraw.

    5.  Defendant's Background

The fifth *Bell* factor is "the defendant's nature and background." *Bell*, 795 F. App'x at 402. Defendant notes he possesses only a GED and that, although he has prior exposure to the criminal justice system, this is his first federal case. While all these things may be true, the Court harbors no concerns that Defendant's background somehow impacted his ability to enter a knowing and voluntary plea. Again, this Court specifically asked Defendant about these issues, and he repeatedly and intelligently satisfied the Court with his answers. The Court also notes that Defendant pleaded to a years-long, complicated money laundering conspiracy, where he employed sophisticated means and straw borrowers to launder hundreds of thousands of dollars in drug-trafficking proceeds to establish his significant real estate holdings and other personal effects. Over the years, Defendant amassed substantial real estate investment properties, which he managed successfully for years. The United States points out that Defendant has filed several pro se filings that demonstrate a high degree of reading, writing, analysis, and synthesizing. [R. 216, p. 18]. The Court has zero concern that Defendant lacked the education or sophistication to understand his plea or make a knowing and voluntary decision. *See United States v. Watkins*, No. 21-1241, 2022 WL 43291, at *2 (6th Cir. Jan. 5, 2022) (considering a 39 year-old defendant with a GED, and noting that "[i]ndividuals with the equivalent of a high school education do not raise red flags with respect to this consideration"); *United States v. Gray*, 627 F. App'x 465, 470 (6th Cir. 2015)

(defendant's GED and work history weighed against withdrawal). This factor thus weighs heavily against granting Defendant's motion to withdraw.

### 6.   Prior Experience with Criminal Justice System

The sixth *Bell* factor is "the degree to which the defendant has had prior experience with the criminal justice system." *Bell*, 795 F. App'x at 402. The United States notes that Defendant is no stranger to the criminal justice system. In addition to the criminal history outlined in the Presentence Report, [R. 194], the United States attaches a CourtNet history pulled before Defendant had multiple cases expunged. [R. 216, p. 19]; [R. 216-1]. According to the United States, the CourtNet record, which is 58 pages long, "reveals that the defendant has been arrested approximately ten times, cited with criminal charges several more times, and indicted on state felony charges five different times." [R. 216, p. 19]; [R. 216-1]. Defendant does not deny his significant involvement in the criminal justice system but highlights that it all occurred in state court and the charges were substantially different than those he faces here. [R. 226, p. 11].

The Court agrees that Defendant's more than twenty years of criminal history "clearly indicates that [he] was not a naive stranger to the criminal proceedings in which he was involved." *United States v. Pluta*, 144 F.3d 968, 974 (6th Cir. 1998); *see also United States v. Wynn*, 663 F.3d 847, 850 (6th Cir. 2011) (finding that a defendant was "familiar with the criminal justice system and plea process because he previously pleaded guilty to charges"). While it is true that this might be Defendant's first experience with federal court, his extensive experience in state court meant he was not a "naïve stranger" to the criminal process. Indeed, many individuals in federal court face their first federal indictment, and this hardly renders them unable to understand the federal process or the consequences of their choices. *See United States v. Watkins,* 815 F. App'x 22, 26 (6th Cir. 2020) (finding that a prior conviction for drug trafficking and a demonstrated ability to

communicate pro se weighed against withdrawal); *United States v. Brown*, 752 F. App'x 309, 315 (6th Cir. 2018) (noting that this factor weighed against a defendant with extensive experience with the criminal justice system even if that experience was exclusively related to state court). Because the Court has no concerns that Defendant failed to understand the nature of the proceedings or the ramifications of his guilty plea, this factor likewise weighs heavily against granting the motion to withdraw.

       7.  Prejudice to the Government

Although the seventh and final *Bell* factor is the "potential prejudice to the government if the motion to withdraw is granted," the United States need not establish this prejudice unless the defendant establishes a "fair and just reason" to allow the withdrawal under the first six factors. *Bell*, 795 F. App'x at 402. Defendant has failed to establish a "fair and just reason" to allow withdrawal of his plea under the previous factors, and in fact, the Court finds for the reasons stated herein he has attempted to manufacture a reason through his false filings, bogus affidavits, and misrepresentations of the record. Nevertheless, the Court will address prejudice since the parties addressed it.

Defendant argues that "[t]he government cannot credibly claim prejudice from having to try a case it was fully prepared to try on the eve of February 6, 2026," the day he pled guilty. [R. 199, p. 18]. The United States points out that

> At the time of Lanham's plea, the United States had fully prepared for trial, having conducted pretrial interviews with dozens of witnesses, many of whom had made special arrangements to travel to the district and/or take time away from work and other responsibilities. When a defendant pleads at the brink of trial, the fact that "the government had [fully] prepared for Defendant's trial, . . . highlight[s] the effect of Defendant's delay, and further weigh in favor of denying Defendant's motion to withdraw." *United States v. Sharp*, 424 F. App'x 475, 484 (6th Cir. 2011); *see also United States v. Durham*, 178 F.3d 796, 799 (6th Cir. 1999) ("allowing Durham to withdraw his plea and forcing the government to prepare its case once again would prejudice the government.").

[R. 216, p. 20]. Although the United States is not required to show prejudice in the absence of a

"fair and just reason" to allow the withdrawal, the United States makes a compelling argument to

establish prejudice.

In sum, the Court has carefully reviewed the applicable factors and finds that they

overwhelmingly weigh against granting Defendant's motion to withdraw his plea. In weighing the

factors, the Court has meticulously reviewed the transcript of the plea hearing, the various filings

and exhibits by Defendant and the United States, and the relevant case law. The Court remains

convinced that Defendant was in the appropriate mental state to make a knowing, voluntary, and

informed plea, unaffected by cognitive impairment or coercion. The Court finds no circumstances

surrounding Defendant's guilty plea that would warrant withdrawing it now. As the *Simmons* court

articulated,

> When a defendant has entered a knowing and voluntary plea of guilty at a hearing
> at which he acknowledged committing the crime, the occasion for setting aside a
> guilty plea should seldom arise. That is so because the withdrawal of a guilty plea
> is inherently in derogation of the public interest in finality and the orderly
> administration of justice.

*Simmons*, 794 F. App'x at 466 (internal citations and quotation marks omitted). Allowing

Defendant to withdraw his plea would jeopardize the public interest in finality as well as the

orderly administration of justice. The motion is denied.

**B. Defendant's Motion for Reconsideration of the Court's May 5, 2026 Order
Denying Motion for Evidentiary Hearing on Motion to Withdraw Guilty Plea
(DN 233), [R. 236]**

As mentioned, Defendant also filed a Motion for Evidentiary Hearing, [R. 228]. The Court

denied that motion, [R. 233], and Defendant has since filed a Motion for Reconsideration of the

Court's May 5, 2026 Order Denying Motion for Evidentiary Hearing on Motion to Withdraw

Guilty Plea (DN 233), [R. 236]. Defendant filed numerous exhibits in support of his motion, all of

which the Court has read in detail. In addition, the Court has reviewed the transcript of the plea hearing, and, more importantly, has a keen recollection of its events. No additional evidence or information is needed for the Court to rule on the pending motion.

District courts may reconsider interlocutory orders pursuant to Federal Rule of Civil Procedure 54(b) and the common law. *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) (citing *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir.1991)). "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Id.* (citing *Reich v. Hall Holding Co.*, 990 F.Supp. 955, 965 (N.D. Ohio 1998)). "This standard . . . vests significant discretion in district courts. . . . A movant has no right to reconsideration of an interlocutory order simply because the movant makes the motion in good faith." *Id.* at 959 n.7.

To briefly summarize, Defendant's motion argues the Court must provide an evidentiary hearing where a defendant seeks to withdraw his guilty plea pursuant to Federal Rule of Criminal Procedure 11(d)(2)(B), as Defendant attempts here. [R. 236, p. 1]. In support, Defendant directs the Court primarily to the Supreme Court's decision in *Machibroda v. United States*, 368 U.S. 487 (1962), as well as to Sixth Circuit decisions applying the *Machibroda* rule. *Id.* at 4–5 (citing *Machibroda* 368 U.S. at 488–96, *Smith v. United States*, 348 F.3d 545, 550–51 (6th Cir. 2003); *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007); *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999); *United States v. Hyde*, 520 U.S. 670, 672–73 (1997)). According to Defendant, these cases "require[] an evidentiary hearing where . . . a Rule 11(d)(2)(B) motion is supported by sworn factual allegation that, if true, would entitle Defendant to relief." *Id.* at 1.

*Machibroda* is Defendant's key case. There, the petitioner sought to set aside his sentence pursuant to 28 U.S.C. § 2255 based, in part, on the allegation that his plea was involuntarily made due to purportedly improper promises and threats made by the Assistant United States Attorney in connection with the plea. *See* 368 U.S. at 488, 490. The district court judge determined the petitioner's allegations were false without holding an evidentiary hearing. *Id.* at 492. The United States Supreme Court found the district court erred in failing to do so, relying heavily on the text of 28 U.S.C. § 2255(b).[2] *Id.* at 494–95. Because the motion and the files of record in the case did not conclusively show that the petitioner was not entitled to relief, the Supreme Court concluded that "the function of 28 U.S.C. § 2255 . . . can be served in this case only by affording the [evidentiary hearing] which its provisions require." *Id.* at 495.

Alongside *Machibroda*, most of Defendant's other cited cases also discussed a petitioner's entitlement to an evidentiary hearing in the § 2255 context, not a *defendant's* entitlement to an evidentiary hearing in the *pre-sentencing* context. *See Smith*, 348 F.3d at 550–51 (discussing the availability of a hearing for "[a] prisoner who files a motion under Section 2255"); *Valentine*, 488 F.3d at 333 (noting a "habeas court" must hold an evidentiary hearing where a factual dispute arises "[i]n reviewing a § 2255 motion"); *Turner*, 183 F.3d at 477 (citing § 2255 and writing that "[w]here there is a factual dispute, the *habeas* court must hold an evidentiary hearing to determine the truth of the petitioner's claims" (emphasis in original)). For this reason, the Court finds them distinguishable and unpersuasive standing alone, as Defendant directs the court to no statutory

---

[2] The statute provides in relevant part:

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

28 U.S.C. § 2255(b).

authority indicating that a requirement similar to § 2255(b) applies outside the habeas context. *See generally* [R. 236]. Instead, Defendant cites *Hyde* for the proposition that the *Machibroda* rule has been extended outside the habeas context. *Id.* at 4–5 (citing *Hyde*, 520 U.S. at 672–73). But while the district court in *Hyde* held an evidentiary hearing to address the defendant's motion to withdraw his guilty plea, that was not the focus of the case, and the United States Supreme Court allocated a single sentence to discuss this background fact. *See Hyde*, 520 U.S. at 672–73. Rather, the Supreme Court's holding pertained to a defendant's ability under the Federal Rules of Criminal Procedure to withdraw his guilty plea before versus after the district court accepts the plea agreement—an issue entirely different from a defendant's purported entitlement to an evidentiary hearing regarding his motion to withdraw his plea. *See id.* at 671 (holding that after a district court accepted a defendant's plea but deferred decision on whether to accept the plea agreement, "a defendant may not withdraw his plea unless he shows a 'fair and just reason' under Rule 32(e)"). *Hyde*, therefore, does not stand for the proposition for which Defendant cites it, as it nowhere mentions § 2255(b), much less purports to extend its requirements to another context. *See generally id.*

Defendant's argument is also unsupported by this Court's own review of applicable caselaw. The Sixth Circuit has repeatedly determined that district courts have significant discretion in whether to hold an evidentiary hearing to address a defendant's motion to withdraw a guilty plea. *See, e.g.*, *Lewis*, 800 F. App'x at 360 ("The denial of an evidentiary hearing to evaluate the merits of a motion to withdraw a guilty plea is within the 'wide discretion of the district court' and is reviewed for an abuse of discretion." (quoting *United States v. Woods*, 554 F.3d 611, 613 (6th Cir. 2009)); *Armstrong v. Wainwright*, 193 F. App'x 577, No. 19-3446, 2019 WL 5874623, at *2 (6th Cir. Oct. 8, 2019) ("[The defendant] did not have a right to an evidentiary hearing with respect

to the motion to withdraw his plea . . . ." (citations omitted)); *United States v. Fofana*, 50 F. App'x 725, 727 (6th Cir. 2002) ("Generally, a defendant is not entitled to an evidentiary hearing simply because he moves to withdraw his guilty plea. . . . Although the district court has the discretion to grant an evidentiary hearing on the motion, no hearing need be granted when the allegations on a motion to withdraw a guilty plea before sentencing merely contradict the record, are inherently incredible, or are simply conclusory." (citation modified)); *United States v. Matthews*, 477 F. App'x 371, 373 (6th Cir. 2012) (finding no abuse of discretion in the district court's denial of the defendant's motion for an evidentiary hearing where the defendant "[did] not allege[] circumstances beyond what we already know").

Moreover, other circuits have held the same. *See, e.g., Hines v. Miller*, 318 F.3d 157, 162 (2d Cir. 2003) ("Both federal and state precedent have established that a defendant is not entitled as a matter of right to an evidentiary hearing on a motion to withdraw a guilty plea." (citations omitted)); *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir. 1992) ("A defendant is not entitled to an evidentiary hearing as a matter of right whenever he seeks to withdraw his guilty plea. . . . [T]he defendant must present some significant questions concerning the voluntariness or general validity of the plea to justify an evidentiary hearing." (citations omitted)); *United States v. Winston*, 34 F.3d 574, 578 (7th Cir. 1994) ("[Evidentiary hearings] should be granted freely, but [they] need not be held when the defendant's motion fails to set forth a 'fair and just reason' on its face." (citations omitted)); *United States v. Browne*, 318 F.3d 261, 264–65 (1st Cir. 2003) ("Ordinarily, the grant or denial of an evidentiary hearing in a plea withdrawal proceeding is said to be confided to the discretion of the trial judge . . . . No matter how serious the general charge, an evidentiary hearing is warranted only if it has some prospect of being productive." (citations omitted)).

Taken together, the Court finds that it was not required to hold an evidentiary hearing to address Defendant's motion to withdraw his guilty plea. Because the Court appropriately exercised its "wide discretion" in denying an evidentiary hearing to evaluate the merits of Defendant's motion to withdraw his guilty plea, *Woods*, 554 F.3d at 613, the Court declines to revisit its previous decision. For the reasons outlined above, the Court finds Defendant has failed to establish any of the three possible grounds by which the Court may reconsider its prior order. *See Rodriguez*, 89 F. App'x at 959. The Court will deny Defendant's Motion for Reconsideration of the Court's May 5, 2026 Order Denying Motion for Evidentiary Hearing on Motion to Withdraw Guilty Plea (DN 233). [R. 236].

**C. Defendant's Motion for Reconsideration of the Court's May 4, 2026 Order Denying Motion to Continue Sentencing (DN 222), [R. 235]**

As mentioned, Defendant also filed a Motion to Continue Sentencing, [R. 197]; [R. 205 (re-filed fully signed)]. The United States responded in opposition, [R. 214], and the Court denied that motion, [R. 222]. After the Court entered its order, Defendant filed a reply, [R. 225], and the Court entered another order, [R. 233], noting that Defendant's reply did not change or impact the Court's ruling,

> The Court has reviewed that reply, and it does not impact or change the Court's May 4, 2026 order entered yesterday, [R. 222], that denies his motion to continue his sentencing. Accordingly, Defendant Joseph Lanham's sentencing hearing remains as scheduled for May 7, 2026, per the terms of the Court's May 4, 2026 order, [R. 222]; *see also* [R. 229 (advancing oral argument to 1:00 PM on May 7, 2026)].

[R. 233]. Defendant has since filed a Motion for Reconsideration of the Court's May 4, 2026 Order [R. 222] Denying Motion to Continue Sentencing [R. 235].

As previously discussed, *see supra* Section II.B, district courts may reconsider interlocutory orders pursuant to Federal Rule of Civil Procedure 54(b) and the common law. *Rodriguez*, 89 F. App'x at 959 (citing *Mallory* 922 F.2d at 1282). "Traditionally, courts will find

- 34 -

justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Id.* (citing *Reich*, 990 F.Supp. at 965). "This standard . . . vests significant discretion in district courts. . . . A movant has no right to reconsideration of an interlocutory order simply because the movant makes the motion in good faith." *Id.* at 959 n.7.

First, this motion repeats some of Defendant's arguments with respect to the alleged conflict with his counsel. [R. 235, pp. 6–8]. As mentioned, *supra* Sections II.A.(2), (4), Defendant has manufactured arguments and evidence to support his alleged "cognitive impairment" position, which then forms the basis of his conflict of counsel arguments. It would upend justice to allow him to manufacture the grounds for a conflict with counsel and then argue that the conflict he manufactured constitutes grounds to withdraw his guilty plea or continue his sentencing. Moreover, at Defendant's *Faretta* hearing, *at Defendant's request*, Magistrate Judge Lindsay permitted Defendant's former retained counsel, Mr. Shunnarah, to remain in the capacity of retained standby counsel. [R. 238]; [*Faretta* Tr., pp. 35–36]. Defendant's conflict argument is wholly unavailing.

Next, Defendant points to the filed rights waiver at [R. 232], arguing it is insufficient to establish his knowing and voluntary waiver of his Sixth Amendment rights. [R. 235, pp. 8–11]. These arguments fail to acknowledge that Judge Lindsay held a detailed and thorough *Faretta* hearing, in which he, among other things, advised Defendant of the charges and penalties and warned Defendant of the risks of pro se representation. [*Faretta* Tr., pp. 25–27, 32–33, 35]; [R. 238]. After being fully apprised of his rights and warned of the risks of pro se representation, Defendant knowing waived his right to counsel and elected to proceed pro se. [*Faretta* Tr., p. 35];

[R. 232 (Waiver of Right to Counsel)]. This argument has no basis and is untethered to the established facts.

Turning to the rest of the motion, Defendant lodges a flurry of arguments that his sentencing should be delayed so he has additional time to prepare, no prejudice will result to the United States, reconsideration will promote "judicial economy and will avoid reversible error," and more. [R. 235, pp. 11–14]. First, the Court notes that Defendant has been aware of the sentencing date since February 6, 2026. The Court set the date at the conclusion of his plea hearing, and no one voiced a conflict or concern with the date. Further, Defendant's own exhibits reflect that he and his counsel worked together to lodge objections to the Presentence Investigation Report ("PSR") and otherwise prepare for the sentencing during the last three months. [R. 194]; [R. 194-1]. Those objections have been noted in the PSR. *Id.* While Defendant is now representing himself pro se, that is a choice he made, waiving his right to counsel knowingly and voluntarily. [R. 232]. Moreover, at Defendant's *Faretta* hearing, Judge Lindsay explicitly warned Defendant that his sentencing hearing was very likely to proceed as scheduled on May 7, 2026, notwithstanding his pro se status, and nevertheless, Defendant knowingly chose to proceed pro se. [*Faretta* Tr., pp. 6, 13]. There is no prejudice or surprise here. Further, Defendant advised that he would continue to retain his counsel, Mr. Shunnarah, in an unofficial role to assist him as he prepared for sentencing. *Id.* at 13. Finally, the Court notes that Defendant's pro se filings leading up to the sentencing have not suffered in quality, content, or volume. *See* [R. 196]; [R. 197]; [R. 198]; [R. 199]; [R. 204]; [R. 205]; [R. 206]; [R. 207]; [R. 214]; [R. 216]; [R. 223]; [R. 224]; [R. 225]; [R. 226]; [R. 227]; [R. 228]; [R. 231]; [R. 234]; [R. 235]; [R. 236]; [R. 237]; [R. 243]; [R. 244]. Defendant has proven to be an adept advocate for himself.

This case has been pending for nearly two years and involves a money laundering conspiracy that spans back a decade to 2016. Defendant admitted that. Accordingly, the public interest in finality and resolution weigh heavily on the need to bring it to conclusion. *See Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 333 (1984) (Stevens, J., concurring in part) ("One of the weightiest of state interests is that favoring speedy, efficient, and uninterrupted disposition of criminal cases."); *United States v. Bilsky*, 664 F.2d 613, 615 (6th Cir. 1981) ("[I]n criminal cases[,] . . . swift and efficient administration of justice is in the interest of both society and accused."). Other courts in similar circumstances have denied last-minute motions to continue sentencings even where the movant proceeds pro se. *See, e.g., United States v. Shumaker*, No. 09-87, 2011 WL 13176084, at *15 (W.D. Pa. Mar. 28, 2011) (describing such filings as "undoubtedly seek[ing] to delay the inevitable" where they occur "as deadlines and/or court appearance dates approach"); *United States v. Ludwig*, No. 2:14-cr-0043 KJM KJN P, 2020 WL 3472387, at *13 (E.D. Cal. June 25, 2020) (noting "the court's obligation to sentence defendants without unnecessary delay" under Federal Rule of Criminal Procedure 32(b)(1) informed its denial of a pro se motion for a continued sentencing where the reason stated was "pretextual"); *United States v. Davis*, No. CR–07–255–S–EJL, 2010 WL 3941908, at *3 (D. Idaho Oct. 6, 2010) (denying a pro se motion to continue a sentencing filed "consistent with [the defendant's] pattern of filing *pro se* motions shortly before hearings"). Defendant's last-minute decision to proceed pro se is insufficient to support a continuance of his sentencing, especially in light of Defendant's longtime knowledge of his May 7, 2026 sentencing date and Defendant's demonstrated adeptness at self-advocacy.

For the reasons outlined above, the Court finds Defendant has failed to establish any of the three possible grounds by which the Court may reconsider its prior order. *See Rodriguez*, 89 F.

App'x at 959. Therefore, for the reasons stated herein, the Court will deny Defendant's Motion for Reconsideration of the Court's May 4, 2026 Order Denying Motion to Continue Sentencing (DN 222), [R. 235].

### D. Defendant's Motion for the Court to Reject the Rule 11(c)(1)(C) Plea Agreement Under Rule 11(c)(3)(A) Based on Material Guideline Misapplication, and to Permit Withdrawal of Plea Under Rule 11(c)(5)(B) and Rule 11(d)(2)(A), [R. 237]

Defendant filed a pro se Motion for the Court to reject the Rule 11(c)(1)(C) Plea Agreement Under Rule 11(c)(3)(A) Based on Material Guideline Misapplication, and to Permit Withdrawal of Plea Under Rule 11(c)(5)(B) and Rule 11(d)(2)(A), [R. 237]. Relatedly, he also filed a Supplemental Sentencing Memo, [R. 244], in which he makes many of the same arguments.

"To the extent the plea agreement is of the type specified in Rule 11(c)(1)(A) or (C), the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report." Fed. R. Crim. P. 11(c)(3)(A). "A defendant may withdraw a plea of guilty or nolo contendere . . . after the court accepts the plea, but before it imposes sentence if . . . (A) the court rejects a plea agreement under 11(c)(5); or (B) the defendant can show a fair and just reason for requesting the withdrawal." *Id.* § 11(d)(2).

The PSR added a four-level enhancement under U.S.S.G. § 2S1.1(b)(2)(C) because it found that Defendant "was in the business of laundering funds." [R. 194, ¶ 43]. The PSR specifically noted that Defendant "is self-employed renting numerous properties that have been purchased utilizing laundered drug trafficking funds." *Id.* Defendant argues that the four-level enhancement detailed in subsection (b)(2)(C) is limited to so-called "third-party launders," who laundered funds for others, and not so-called "self-launders," who launder the funds from their own underlying offense. [R. 237, pp. 5–6]. Specifically, Defendant argues that because subsection (b)(2)(C) is limited to individuals who were "in the business of laundering funds," and because Defendant "did not launder funds for third parties" and "did not earn a fee or commission for

laundering services," the four-level enhancement should not be applied to him. *Id.* Defendant points to the language in Application Note 4(A) to support this interpretation. The full Application Note states the following:

> (A) **In General.**—The court shall consider the totality of the circumstances to determine *whether a defendant who did not commit the underlying offense* was in the business of laundering funds, for purposes of subsection (b)(2)(C).
> (B) **Factors to Consider.**—The following is a non-exhaustive list of factors that may indicate the defendant was in the business of laundering funds for purposes of subsection (b)(2)(C):
> > (i) The defendant regularly engaged in laundering funds.
> > (ii) The defendant engaged in laundering funds during an extended period of time.
> > (iii) The defendant engaged in laundering funds from multiple sources.
> > (iv) The defendant generated a substantial amount of revenue in return for laundering funds.
> > (v) At the time the defendant committed the instant offense, the defendant had one or more prior convictions for an offense under 18 U.S.C. § 1956 or § 1957, or under 31 U.S.C. § 5313, § 5314, § 5316, § 5324 or § 5326, or any similar offense under state law, or an attempt or conspiracy to commit any such federal or state offense. A conviction taken into account under subsection (b)(2)(C) is not excluded from consideration of whether that conviction receives criminal history points pursuant to Chapter Four, Part A (Criminal History).
> > (vi) During the course of an undercover government investigation, the defendant made statements that the defendant engaged in any of the conduct described in clauses (i) through (iv).

§ 2S1.1 cmt. n.4(A) (emphasis added). Defendant does not argue in his motion that the factors are not satisfied based on the facts of his case. He only makes the legal argument that the enhancement does not apply to "self-launderers." *See* [R. 237, pp. 5–6]. Relatedly, Defendant also filed a Supplemental Sentencing Memo, [R. 244-1], in which he makes many of the same arguments.[3]

The First Circuit addressed this exact issue and ultimately determined that the district court's application of the four-level enhancement did not constitute clear error. *United States v. Aguasvivas-Castillo*, 668 F.3d 7, 13–14 (1st Cir. 2012). While not deciding whether subsection

---

[3] To the extent Defendant makes factual arguments concerning the Guideline's application to this case in his Supplemental Sentencing Memorandum, [R. 244-1], the Court addressed those during the sentencing hearing.

(b)(2)(C) applied to a defendant who committed the underlying offense, in concluding that the district court's decision was not clearly erroneous, the First Circuit noted that "there is some tension between the text of Guideline § 2S1.1(b)(2)(C) and its Application Notes and legislative history." *Id.* at 14. The First Circuit further noted that "[t]he Commission determined that, similar to a professional 'fence', *see* § 2B1.1(b)(4)(B), defendants who routinely engage in laundering funds on behalf of others, and who gain financially from engaging in such transactions, warrant substantial additional punishment because they encourage the commission of additional criminal conduct." *Id.* (citing U.S.S.G. app. C, vol. II, at 223 (2003)).

While the Court acknowledges this tension, the Court begins, as it must, with the language of the guidelines. *United States v. Gould*, 30 F.4th 538, 543 (6th Cir. 2022) ("In interpreting the Sentencing Guidelines . . . the traditional canons of statutory interpretation apply. Under those canons, we begin with the plain meaning of the relevant text; if that language is unambiguous, our analysis begins and ends there." (citations and quotation marks omitted)). The clear language of subsection (b)(2)(C) does not suggest that its application is only limited to so-called third-party launders. It provides without exception that "[i]f (i) subsection (a)(2) applies; and (ii) the defendant was in the business of laundering funds, increase by 4 levels." § 2S1.1(b)(2)(C). Subsection (a)(2) does not apply only to defendants who did not commit the underlying offense. Rather, as instructed by subsection (a)(1), subsection (a)(2) also applies if the offense level for the underlying offense cannot be determined, which is the case here. [R. 194, ¶ 41]; *see also* U.S.S.G. § 2S1.1 cmt. n.3(A) ("Subsection (a)(2) applies to any case in which (i) the defendant did not commit the underlying offense; or (ii) . . . the offense level for the underlying offense is impossible or impracticable to determine."). Thus, a defendant who committed the underlying offense and a defendant who did *not* may both properly fall under subsection (a)(2).

Because of this fact, and because the clear language of subsection (b)(2)(C) applies to *all* defendants who fall under subsection (a)(2), so long as they are also in the business of laundering funds, the plain language and structure of § 2S1.1 demonstrate that Application Note 4(a) does not limit subsection (b)(2)(C) to only the class of defendants who did not commit the underlying offense. *See also United States v. Havis*, 927 F.3d 382, 386 (6th Cir. 2019) ("Commentary binds courts only 'if the guideline which the commentary interprets will bear the construction' . . . . Thus we need not accept an interpretation that is 'plainly erroneous or inconsistent with the' corresponding guideline." (quoting *Stinson v. United States*, 508 U.S. 36, 45–46 (1993))).

The best reading of § 2S1.1 is that subsection (b)(2)(C) also extends to defendants who commit the underlying offense and have a business of laundering their own funds. The legislative history does not suggest that subsection (b)(2)(C) was meant to *exclude* self-launders from receiving this enhancement. If that were the intent, we would expect to find some evidence in the language of subsection (b)(2)(C). Instead, the application note and legislative history only suggest that a principal motivation was to *cover* third-party launders whose activity "encourages the commission of more crimes by creating a market for criminal proceeds." *United States v. Salinas-Salcedo*, 153 F.4th 589, 594 (7th Cir. 2025) (citing *Aguasvivas-Castillo*, 668 F.3d at 14). This motivation is not undermined by or in conflict with self-launders being subject to the enhancement as well. Instead, this understanding harmonizes the clear language and structure of § 2S1.1 with the application notes and legislative history. *See also United States v. Pacheco*, No. 23-5762, 2025 WL 2060779, at *10 (6th Cir. July 23, 2025) ("Appellants thus incorrectly argue that they can only be subjected to this enhancement if their activities 'were similar to those of a professional fence that routinely engaged in the laundering of monies and gained therefrom substantial financial gain.' They have improperly collapsed together two separate factors — routine or regular

- 41 -

engagement (Factor 1 above) and generation of substantial revenue (Factor 3 above) — to erect a higher bar to the enhancement.").

Lastly, to conclude otherwise would lead to an absurd application of § 2S1.1. Namely, to reach a different result would mean individuals like Defendant, who *did* commit the underlying offense but fall under (a)(2) because the offense level of the underlying offense is not determinable, do *not* get the four-level enhancement even if they *are* in the business of laundering funds, while those who did *not* commit the underlying offense *do* get the four-level enhancement. Put another way, in instances where the offense level of the underlying offense is not determinable, a defendant who is in the business of self-laundering his own funds would be rewarded by actually committing the underlying offense. That result is in direct conflict with the structure and purpose of subsections (a)(1) and (a)(2). The Court finds that, under the clear language of the guideline, § 2S1.1(b)(2)(C) applies to all classes of defendants under subsection (a)(2), including those who laundered funds for themselves or for others. Accordingly, the Court rejects Defendant's argument that the application of § 2S1.1 supports either rejecting or withdrawing his plea under Rule 11.

## III.   CONCLUSION

For the above-stated reasons, the Court will deny Defendant's pending motions. Accordingly, and the Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED** as follows:

1. Defendant's Pro Se Motion to Withdraw Guilty Plea Pursuant to Federal Rule of Criminal Procedure 11(d)(2)(B), [**R. 199**]; [**R. 207** (re-filed fully signed)], is **DENIED**.

2. Defendant's Motion for Reconsideration of the Court's May 4, 2026 Order Denying Motion to Continue Sentencing (DN 222), [**R. 235**], is **DENIED**.

3.  Defendant's Motion for Reconsideration of the Court's May 5, 2026 Order Denying Motion for Evidentiary Hearing on Motion to Withdraw Guilty Plea (DN 233), [**R. 236**], is **DENIED**.

4.  Defendant's Motion for the Court to Reject the Rule 11(c)(1)(C) Plea Agreement Under Rule 11(c)(3)(A) Based on Material Guideline Misapplication, and to Permit Withdrawal of Plea Under Rule 11(c)(5)(B) and Rule 11(d)(2)(A), [**R. 237**], is **DENIED**.

5.  Defendant's Motion for Leave to File Supplemental Sentencing Memorandum Out of Time, [**R. 244**], is **GRANTED**. Defendant's Supplemental Sentencing Memorandum and Preservation of Guidelines Objections Under Fed. R. Crim. P. 32(i)(1)(D), [**R. 244-1**], **SHALL** be deemed timely filed.

This the 13th day of May, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF KENTUCKY